## COUNTY OF PROVIDENCE, MARCH TERM, 1872, AT PROVIDENCE.

10 165
15 264

10 165
24 247

PRESENT :

Hon. GEORGE A. BRAYTON, Chief Justice.
Hon. THOMAS DURFEE, } Justices.
Hon. ELISHA R. POTTER, }

---

## GEORGE H. ANTHONY vs. HENRY S. HUTCHINS & another.

A conveyance obtained by one person from another, where advantage is taken of the latter's weakness or clouded or enfeebled faculties, will not be sustained by a court of equity. But it is not sufficient to suggest mere weakness or indiscretion of the party conveying; it must be shown that there was fraud in the party contracting, or some undue means made use of to control that weakness; and in such case, though fraud be found, it does not necessarily follow in equity that the deed must be absolutely set aside as void; it may be allowed to stand as security for whatever amount, if any, may be found to have been actually due between the parties.

BILL IN EQUITY to set aside two powers of attorney executed by the complainant April 8, 1867, by each of which he authorized Chester P. Hutchins, one of the respondents, to convey ten shares of American Screw Company stock, being the property of the complainant.

The bill alleged that George H. Anthony, the complainant, was on the 8th of April, 1867, and for several years previously

had been, clerk in the wholesale grocery store of Henry S. Hutch-
ins, one of the defendants. On that day Anthony was told
by Henry S. Hutchins, Chester P. Hutchins, and Jabez C. Pot-
ter, that he, Anthony, had been detected in taking goods fraudu-
lently from his employer's store, and subsequently on that day
executed two powers of attorney to Chester P. Hutchins, by
each of which he authorized said Chester P. to convey ten shares
of stock then belonging to him in the American Screw Com-
pany. Ten of said shares were afterwards, under one of said
powers of attorney, transferred by said C. P. Hutchins to said
Henry S. Hutchins, he, said C. P. Hutchins still, and up to the
time of the filing of the bill, continuing to hold the power of at-
torney for the other ten. Anthony also on said day placed in
the hands of said C. P. Hutchins his certificate of said twenty
shares of stock.

The bill prayed that the said powers of attorney and transfer
might be decreed to be set aside as void; or at the most to be
held as security to said Henry S. Hutchins for any of his goods
which might be shown to have been abstracted by said Anthony;
the bill alleging that the complainant at the time of their execu-
tion was in a feeble state of health in body and mind, and being
subject to epilepsy, and alleging that he was on said day confined
and kept in custody by said H. S. Hutchins, C. P. Hutchins, and
J. C. Potter, and by that means and by means of alleged threats
of prosecution, so worked upon as to cause him to execute said
instruments unadvisedly and without an opportunity to consult
his family or friends; and also alleging that the complainant
misunderstood the import and effect of one of said powers of at-
torney, and supposed that he was executing only one power of
attorney authorizing the transfer of ten shares of said stock to
Henry S. Hutchins as security as aforesaid, and that the other
paper was a duplicate of the first or some other paper needed to
effect said transfer. The bill also denied that said Anthony had
abstracted any of said H. S. Hutchins's goods in manner afore-
said.

The answer of the defendant Henry S. Hutchins denied that
said Anthony was on said day arrested or taken into custody by
him or by any one, or that he was by any such confinement or
restraint, or by any duress or threats of exposure or imprison-

ment induced to execute said powers of attorney, and also denied having on said 8th day of April made any false charge or accusation against the complainant, or having held out any inducements to persuade him to transfer said stock.

Said answer alleged that he (said Henry S. Hutchins) had missed large quantities of goods from his store since the complainant had been clerk for him, for which no account had been given, and admitted that he and his co-defendant did on said 8th of April charge said complainant with purloining and fraudulently taking a large quantity of goods from said Henry S. Hutchins's store, and did say that they had proof thereof, which charge and statement was true to the best of said defendants' knowledge and belief. Also stated that said complainant on said day confessed to the defendants that he had been taking goods fraudulently from the store of said H. S. Hutchins since September, 1866. Also that he, said defendant, was informed and believed that on the morning of said 8th of April, 1867, said complainant was detected in the act of fraudulently abstracting from said store a ream of paper and a keg of butter, the property of said H. S. Hutchins. Also that said complainant on said day acknowledged and confessed in the presence of said H. S. Hutchins, and of Chester P. Hutchins, George Hutchins, and Jabez C. Potter, that the said complainant had so fraudulently abstracted said ream of paper and keg of butter from said store. Also that the said complainant on said day acknowledged that he had fraudulently abstracted from said Hutchins's store large amounts of said Hutchins's goods, and had converted the same to his own use, to the value of $5,000 and upwards, and that said acknowledgment was made in the presence of said Henry S. Hutchins, and of Chester P. Hutchins, George Hutchins, and Jabez C. Potter, and was made by said complainant freely and voluntarily of his own motion, without any duress or threats of exposure or imprisonment. And that said complainant voluntarily and at his own suggestion, proposed to convey to said H. S. Hutchins said ten shares of stock for the value of the goods so acknowledged to have been fraudulently abstracted, and did so convey the same, through said Chester P. Hutchins, under said power of attorney, executed by said complainant for that purpose. And that said other power of attorney covering said

other ten shares of stock was made by the complainant to said Chester P. Hutchins, under an agreement that the same should be held by said Chester P. Hutchins as security to indemnify said Henry S. Hutchins for the amount of any goods which might prove to have been abstracted from said store by the complainant above the value of the said ten shares of stock actually conveyed to said Henry S. Hutchins, as aforesaid. And also, that the said complainant of his own motion first suggested the transfer of said stock, and earnestly insisted upon making such transfer, and that said defendant, Henry S. Hutchins, advised and urged the complainant before said powers of attorney were executed to notify his father and friends in regard to the matter, but said complainant declined so to do.

The answer of Chester P. Hutchins, in addition to the statements substantially as contained in the foregoing answer, further stated that he, the said Chester P. Hutchins, knew of his own knowledge that said complainant, on said 8th of April, 1867, fraudulently abstracted one keg of butter from said store, as he personally detected him in so doing, and that said complainant acknowledged to this defendant the fraudulent taking of the same, and also that for a long time previously he had been fraudulently taking from said store large quantities of goods, and had so taken the amount of $5,000 and upwards; and also that this respondent went with the complainant to the house of the complainant's father to get the certificate of said stock, the complainant going into the house alone, and remaining there for nearly half an hour and returning of his own accord. And also that the complainant was fully aware of the nature of both of said powers of attorney, the same having been fully explained to him, and he having been informed by said respondent some two or three hours before the same were executed that the same were being drawn, and that the complainant advised and consented thereto, and freely and voluntarily executed the same. And also that this respondent had no interest directly or indirectly in said stock of the American Screw Company, or in the said store or business of Henry S. Hutchins.

*James Tillinghast & Carpenter*, for the complainant. I. The complainant is entitled to have this stock retransferred, and the powers of attorney and stock certificates surrended up to him.

Having been obtained from him in the manner they were, the respondent cannot be allowed to hold them for any purpose, particularly as he has an ample remedy at law if he has any valid claim against the complainant, and there can be no pretence upon the proof but what the complainant is amply able to respond.

The whole transaction should be declared void and set aside. 1st. On account of the then physical and mental condition of the complainant. 2d. On account of the confidential relations then existing between him and said Henry S. Hutchins. 3d. On account of the duress practised upon him. Either of these causes is sufficient in itself, but when combined as they are here, they certainly entitle the complainant to this full relief. 1 Story Eq. Juris. §§ 218, 221 to 230, 234 to 238, 239, 307, 308, 311, 323, 329 a; *Nicholls* v. *Nicholls*, 1 Atk. 409; *Peasley* v. *Magrath*, 2 Sch. & Lef. 29; *Conant* v. *Jackson*, 16 Vt. 335; *Neilson* v. *McDonald*, 6 John. Ch. 201; *McCormick* v. *Malin*, 5 Blackf. 509; *Meadows* v. *Smith*, 7 Ired. Eq. 7; *Foss* v. *Hildreth*, 10 Allen, 76; *Wellborn* v. *Tiller*, 10 Ala. 305.

No alleged admissions of the complainant, even if satisfactorily and consistently proved, can be weighed against him. 1 Green. Ev. § 193; *Tilley* v. *Damon*, 11 Cush. 247; *Tucker* v. *Barrow*, 7 B. & C. 623.

II. At all events, the respondent can hold this stock for only what he can show on a proper account taken he has actually lost through the complainant. His answer only claims that it was transferred to him *as indemnity*, and this by settled rules is conclusive, and no proof to the contrary can be received. *Longmate* v. *Ledger*, 6 Jur. N. S. 481; 1 Story Eq. Juris. § 238 a. And this account should be taken entirely independently of any alleged admissions of the complainant on that 8th of April.

*Ashley & Colwell* (with whom was *Browne*), for the respondents. I. As to the prayer in the bill to set aside the conveyance of the ten shares of stock which were transferred to Henry S. Hutchins. 1. The transfer of said ten shares to H. S. Hutchins is a transaction wholly executed. The complainant, in seeking to have it set aside, must make out his case accordingly. 2. The consideration for the conveyance of these shares was the value of

goods abstracted by the complainant, Anthony, from the store of said Henry S. Hutchins.

II. As to the prayer to have the ten shares of stock transferred to H. S. Hutchins declared still to be the property of the complainant, and held as collateral security. This cannot be done unless it conforms to a contract to that effect entered into by the parties. The contract which was made between the complainant and respondents, and the manner, form, and purpose of the transfer are set up in the answers, and are perfectly clear from the testimony. Ten shares were conveyed to Henry S. Hutchins in compensation for an amount of goods admitted to have been abstracted from the store. The other ten shares were placed as collateral security for any further amount of goods which might prove to have been abstracted.

III. The bill charged fraud on the part of the respondents. If no fraud is shown, the complainant is not entitled to any relief under the bill, and so cannot in this suit have any decree relating to the ten shares still held by Chester P. Hutchins as collateral security under the second power of attorney. *Mount Vernon Bank* v. *Stone*, 2 R. I. 129 and cases there cited; *Tillinghast, Receiver*, v. *Champlin & others*, 4 R. I. 173. Particularly pages 194–202.

IV. If it is satisfactorily proved that Hutchins's property had been abstracted by Anthony to the amount of the value of the ten shares of stock, then the transaction by which that stock was transferred to H. S. Hutchins in restitution was a fair, just, and equitable transaction. If the equities are equal, the court ought not to interfere. The court will seek to uphold the contract if possible.

Again, if the testimony of the abstraction of Hutchins's goods by Anthony is sufficient, the complainant does not come with clean hands to invoke the aid of a court of equity, but stained with the wrong he has committed upon the party against whom this proceeding is brought. It cannot be reasonably supposed that Anthony transferred the ten shares of stock to H. S. Hutchins merely as *collateral security*, if it sufficiently appears by the evidence that he admitted that he had taken goods to the FULL VALUE of that stock.

If the court are satisfied that Hutchins's goods had been ab-

stracted by Anthony, as above stated, then Henry S. Hutchins is entitled to be protected in his possession of the stock turned over to him as aforesaid, even if Anthony had in this case a claim to be defended (which he has not). Willard's Equity, p. 45.

BRAYTON, C. J. From the bill and answer it appears that the plaintiff had been for many years in the defendant's employ as clerk; that on the eighth day of April, 1867, he held in his own right twenty shares of the stock of the American Screw Company; that he had been for some time prior to said eighth day of April, 1867, subject to attacks of epilepsy, by means of which and other causes his health had become affected, his nervous system weakened, and his mental strength impaired. That on the said eighth day of April, being then in said defendant's store at work, he was approached unexpectedly by one Jabez C. Potter, a police officer and detective, who requested him to follow him up-stairs, and whom he did follow. That said Potter then accused him of fraudulently taking and purloining the defendant's goods and converting them to his own use. That soon they were joined by said defendant and by his brother Chester P. Hutchins, who repeated the same accusations and declared that they had proof of such taking. It is not denied by the answer that the same accusations were repeated to him from time to time during the day.

The bill charges that the complainant was kept under surveillance and restraint until a late hour in the evening, whereby he became wrought upon and alarmed, and his fears excited lest he should be exposed and subjected to imprisonment, and he and his good name disgraced, so that he improvidently and unadvisedly, without advising with his friends or counsel, but relying upon the confidential relations subsisting between him and said H. S. Hutchins, turned over to said Hutchins sixteen shares of Screw stock, of the value of five hundred dollars each, as security for what said Hutchins claimed he had lost by him.

To this Hutchins answers, that the complainant was not arrested nor taken into custody by the officer, nor induced by duress, or threats of exposure or imprisonment, to execute the transfer of said shares, or any other paper or power without any consideration, and the transfer was made solely to indemnify him for the value of goods acknowledged to have been fraudulently taken by the complainant, and for no other purpose.

The bill denies that the plaintiff ever took any of the property of said H. S. Hutchins, or ever fraudulently converted any of it. The answer only affirms that the defendant is informed and believes that the plaintiff was detected in taking and converting a keg of butter and a ream of paper of the defendant, and that the plaintiff freely admitted taking and converting other goods of the defendant since November, 1866, and that the value of the goods so taken amounted to five thousand dollars and upwards. The answer nowhere asserts that other goods were in fact taken. It does deny that the confession was induced by duress, or threats of exposure or punishment. The answer does not deny the allegation of the bill, that the plaintiff had been subject to attacks of epilepsy, by which, and other causes, his health had become affected, his nervous system weakened, and his mental strength impaired. But all the respondents testify that there was that day no appearance of unsoundness of mind.

The evidence as to the condition of the plaintiff physically and mentally is as follows : —

Townsend had known him for twenty years. He had been for two or three years subject to fits of epilepsy. He had known him to have had four. Their effect was to weaken him physically and mentally. Just prior to April 8, he was very uneasy, walking about his room. Would sit down, and then get up again, and was very much excited. His brother, Frederick Anthony, says he has been subject to such attacks for three years ; had known ten attacks. His physical health and mental capacity impaired very much. Since his return from New York, he appeared more excitable, easily alarmed and excited ; has seen very small matters affect him very much. Just prior to April 8, he noticed for several mornings that he appeared very much excited when he came to breakfast ; face flushed ; watched him, expecting an attack of epilepsy. He had a fit on the twenty-fifth of April, when Dr. Mason attended him. During this illness he had five or six fits on the same day ; was excited and nervous. Anthony says that he denied the charge made by Potter, and by Henry S. Hutchins, and by Chester P. Hutchins ; that when they came up and talked they worried him so that he hardly knew what he was about. Dr. Peckham, a physician, says he could not have been able to transact busi-

ness for six months prior to this time. The epileptic fits would render him susceptible to be easily imposed upon. Dorsey testifies that such attacks weaken the mental powers, so that one is easily influenced by persuasion or intimidation. Dr. Mason had known of these fits for three years. The tendency of them was to weaken the mind, make one nervous, irritable, apprehensive, render the mind weak, the will weak. He attended him on the twenty-sixth of April. Found him in such a state as to show great anxiety and excitement, and his opinion was, that he was not competent to do business. John Foster saw him that morning, April 8, before the officer came, or any accusation was made. He had known him all the while. He says he was not competent to do business, and had not been for six months before. He was under excitement. Henry S. Hutchins, although he testifies now that he was well and competent, it seems had a different opinion then. Foster says he told him he had arrested Anthony and he was up-stairs with the officer Potter, and when asked . why he did not let him come down, replied that he was in such a state of mind that he would go into the river, and he did not dare to let him come down. Hutchins said to J. L. Pierce, in reply to his question, "You are not afraid of his running away?" "He is in that state of mind, that if left alone he would throw himself into the river." So he said to Daniel A. Pierce that George was in a *terrible shape* now, up-stairs, Potter with him. He was afraid he would kill himself if left, and if he was out he would jump off the wharf. This declaration of Henry S. Hutchins was made early in the course of these proceedings, and before any confession or talk of making any transfer, as early as ten o'clock in the day, as the witnesses say. At the time when Chester P. Hutchins says he did admit taking goods, when he was told it might be proved, he expressed his then condition by the word "wilted." "He looked subdued."

Anthony says he was that morning, when Potter, the officer, came, about his ordinary business in the store. Potter came in and called him up-stairs away from what he was doing, and then accused him of criminally taking Hutchins's goods, which he denied. All the evidence agreed in this. Potter was known to be an officer, and Anthony asked if he was under arrest. The officer replied yes, and pulled from his pocket a paper, calling An-

thony's attention to it, as if it were a warrant.  Anthony asked about bail, and was told he must go before Judge Randolph. Anthony said that would publish the accusation, and it would be talked about.  Then Henry S. Hutchins and Chester P. Hutchins came up and accused him, talked and worried him so that he hardly knew what he was about.  Then he was left with Potter for forty-five minutes, when Henry S. Hutchins came up and asked him how he proposed to settle the matter, asked how much Screw stock he had, and was told how much.  Said he would hush it up for that.  Anthony objected that it was too much, for Hutchins had not had so many goods in value in his store for three years at any one time.  But Hutchins proposed that he should make over ten shares of stock, and then probably it would be found that all was right, and he would make them over again to Anthony.  Anthony then said: " I will do that rather than my friends should know I was ever accused of anything."

Potter, the officer, went there with the purpose, and remained there in the expectation, of arresting the plaintiff unless the matter was settled.  He expected to work the matter up, as he expressed it, to a good settlement.  He did not actually and formally make any arrest, and, as he says, he had no warrant in fact from any magistrate; but when asked by Anthony after he had charged him criminally if he was arrested, the answer was yes, and he then, as Anthony says, and the officer does not deny, pulled from his pocket a paper and called plaintiff's attention to it, as if it were a warrant, and when the plaintiff then asked about bail, Potter told him he must go before Judge Randolph, the magistrate.  Potter does not deny saying this.  The plaintiff was left to believe he was under arrest.  Potter was asked further why he kept watch of him and within reach of him all the while, and his answer is he was fearful he might escape and not be arrested.  Foster testified that he, Potter, directed another person to look out for him, and not let him get away.  When asked by Foster, " How can you settle if he was under arrest? " he simply replied, " I had no warrant."

From Potter's testimony it must be inferred that the plaintiff was kept under surveillance that he might not escape, and might be arrested if he did not settle with Hutchins.  Potter did not

leave until the powers were executed and the settlement completed, and he had received his pay for his services, such as he usually received when he had worked a case up to a good settlement.

There was much talk there between the Hutchins's, Potter, and Anthony, for hours, — as Chester P. Hutchins says; long enough to have so worried Anthony, as he says, that he hardly knew what he was doing. This long talk took place, and he cannot say at what period of it Anthony made any admission of guilt. It was still longer before he agreed to transfer any stock, for he says that as soon as it was settled that a transfer was to be made, Anthony went directly for the certificate, and this by the testimony of Anthony and of Hutchins was not until near six o'clock P. M., some six hours after the charge was first made.

Now Mr. Hutchins says that the transfer was first suggested by Anthony, who volunteered freely and readily to make over the stock. Why so long a delay, if he was ready from the begining to convey and Hutchins ready to receive it? Henry S. Hutchins, the respondent, says Anthony was not arrested; no warrant was served; that he knew that he was not under restraint, and thinks he did not state to Foster that he was arrested and controlled. He, Anthony, did not want the matter made public. Foster testified that he, Hutchins, told him Anthony was arrested, and was up-stairs with Potter, and he said to him, "How can you settle while he is under arrest?" That Hutchins requested him to keep it secret. Chester P. Hutchins says: "I went up. Anthony had been accused when he went up, and had denied it. I told him what I saw, and he wilted. Then he confessed. Nothing said about being arrested or anything of the kind. No inducement to transfer. He was told it would not compromise any crime committed. It was his own offer. He went for the certificate as soon as he proposed to transfer, from three to six o'clock P. M. Anthony says he went about 5.45 P. M. I did not go away until it had all been arranged. There was three hours' conversation; the confession was made in that time sometime. We were not to harp it about town. Can't say he offered to transfer stock for the goods. Anthony wished to keep it secret that he had been accused. It would kill his mother if known to her. He was willing to do anything to at-

tain this end." Henry S. Hutchins says they were not to harp it about, not to speak of it. Chester P. Hutchins says they gave Anthony to understand they would not, but would keep it secret, and though they would not compromise a crime, they would not make complaint of it.

Story says that the doctrine may be laid down as generally true, "that the acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice, or undue influence." Story's Eq. Juris. § 238. Marshall, C. J., in *Harding* v. *Hardy*, 11 Wheat. 103, says: "If deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them. It is the peculiar province of a court of conscience to set them aside. That a court of equity will interpose in such a case, is among its best settled principles." And the principle upon which equity will give relief, as against persons standing in the relation of guardian and ward, solicitor and client, parent and child, trustee and *cestui que trust*, will be extended to all the variety of relations in which dominion may be exercised by one person over another. And where the deed is obtained from a person greatly under the power of another, where there is ground of inference that advantage is taken of his weakness, or clouded or enfeebled faculties, the rule will be applied.

It is not sufficient to suggest mere weakness or indiscretion of the party, unless it also be shown that there was fraud in the party contracting, or some undue means made use of to induce the agreement and control that weakness. The degree of mental weakness may be below that which would justify a commission of lunacy, or the appointment of a guardian, if it has been taken advantage of for the purpose. The cause of the weakness is not material. It may be from duress, general imbecility, accidental depression, constitutional despondency, or the result of sudden fear or apprehension; and it is said that if he is a man of weak understanding, is harassed and uneasy, if at the time it cannot be

supposed that he had a mind adequate to the business which he was about, and he might be very easily imposed upon. " Cases of an analogous nature may easily be put, where the party is subjected to undue influence, although in other respects of competent understanding. As, where he does an act, or makes a contract, when he is under duress, or the influence of extreme terror, or of threats, or of apprehension short of duress. For, in cases of this sort, he has no free will, but stands *in vinculis.* . . . . On this account courts of equity watch with extreme jealousy all contracts made by a party while under imprisonment; and if there is the slightest ground to suspect oppression or imposition in such cases, they will set the contracts aside." Story's Eq. Juris. § 239.

" In order to avoid a grant on the ground of undue influence, it must be shown that the influence existed, and was exercised for an undue and disadvantageous purpose. The former point may be inferred from the relative or actual position of the parties, but the latter must be determined by an examination into the nature and results of the transaction which is called in question. 3 White & T. Lead. Cas. 125 (2d Am. ed. notes to *Huguenin* v. *Baseley*). It is not necessary to amount to actual fraud if the influence be exerted to produce disadvantageous results to the other party. *Whelan* v. *Whelan*, 3 Cow. 537. If it be shown that the respondent necessarily had undue influence or control, so that the parties did not treat on equal terms, the court may give relief. 3 White & T. Lead. Cas. 123 (2d Am. ed.). Relief is not denied on the ground that respondent used no undue influence to mislead, and was ignorant of the incapacity. Neither is it sufficient to prevent relief that the party asking relief proposed the contract. Ibid. 146.

There may be some question whether the conveyance of the stock in this case should be declared utterly void, and entirely set aside. Courts of equity are not left, as are courts of law, to the alternative of setting aside a conveyance, or of refusing any relief, but may make the conveyance subserve the whole equities of the case.

In *Boyd* v. *Dunlap*, 1 John. Ch. 478, the deed was sought to be set aside as voluntary and without consideration, and made fraudulently. There was not sufficient evidence of fraud to de-

clare it void. The chancellor said he did not discover such proof of absolute fraud as to warrant him in directing the conveyance of the real estate to be delivered up and cancelled as absolutely null and void. That it was an ordinary case in that court, that a deed, though not absolutely void, yet if obtained under unequitable circumstances, should stand only as a security for the sum really due. So in *Dunn* v. *Chambers*, 4 Barb. S. C. 376. The fraud charged in that case was not satisfactorily proved, nor was there satisfactory proof of bad faith, but there was great inadequacy of price, although the attention of the grantor was called to it at the time. The court held that though the deed was not fraudulent and void, yet that it was obtained under such circumstances as made it unfair for the defendant to retain the full advantage which the deed gave him, if he were indemnified.

*Herne* v. *Meeres*, 1 Vern. 465. This was a purchase at an under value, with other suspicious circumstances attending it, and it was set aside upon terms. The lord chancellor said: "At law, where a conveyance is found to be fraudulent, the creditor comes in and avoids all, without repayment of any consideration money; and in equity, therefore, where the court can decree back the principal and interest, there is no hurt done; and a lesser matter in such a case will serve to set a conveyance aside." Nothing can be more equitable than this mode of dealing with conveyances of such dubious and indecisive aspects that they cannot be entirely suppressed or entirely supported with satisfaction and safety. See *Meadows* v. *Smith*, 7 Ire. Eq. 7.

The case of *Heath* v. *Cobb*, 1 Dev. Eq. 187, is a case more nearly resembling the case before us. The plaintiff was accused of stealing cotton, and of burning a gin-house. The bill alleged that the defendant proposed to him then to confess a judgment for $150, and if he would it should not be enforced if he, the plaintiff, suffered corporal punishment in consequence of the prosecution, and thereupon he did confess the judgment and averred his innocence. The answer denied any such proposition on the part of the defendant, and averred the proposition came from the plaintiff, and that he offered to pay $250, the estimated amount of defendant's loss; denied any promise that judgment should not be enforced, or that it should affect the prosecution. That he would not compound the crime, but if plaintiff was found guilty

he would not ask judgment. Plaintiff was informed of this while in jail. That the judgment was confessed for the sake of softening the prosecution, and not alone for the agreed damages for the civil injury. The court say the defendant acted as fairly as he could, and did nothing wrong except taking a judgment from a man in his situation and state of mind.

It is not put on the ground that the defendant practised on the fears of the plaintiff, or used improper means to influence him. He felt himself in the defendant's power, and, with a spirit subdued, was willing to give up without reference to the actual damages sustained, upon the hope entertained that the prosecution might be warded off. Defendant is by no means obnoxious to the censure of actual oppression or imposition, and his losses, by the theft are established beyond doubt, and the participation of the plaintiff is also clear. The judgment is not to be perpetual. Defendant may have leave to institute a suit at law against the plaintiff for the trespass and damages.

There was evidence sufficient to raise a strong suspicion at least, that on the eighth of April there was a dealing of the plaintiff with the goods of the defendant Henry S. Hutchins, with a purpose privately to arrest them, and with the testimony of three witnesses we are compelled to the conclusion that he did confess to have taken other goods, though he denied it to all of them at first, and persisted for some time in that denial, and he now denies his guilt as to any. To Henry S. Hutchins, as he testified, Anthony said that he had taken goods since he came from New York, after his sickness there in November, 1866, four months before this transaction; that nothing was said of his taking any goods before. Hutchins's stock of goods during that period was at no time greater in amount and value than about $3,000, yet he says that Anthony acknowledged the taking from the store during that period of some $5,000 worth of goods, equal in amount to the value of ten shares of Screw stock.

It is hardly to be believed that he thought so many goods had been taken in so short a time from so small a stock, and not be missed at the time, nor now be proved to have been taken, and we can hardly feel assured that he was taking this transfer merely for indemnity and was not willing to take more than the

amount of his loss, upon any evidence that he had.    We do not, however, here pass upon the absolute guilt or innocence of the plaintiff.

POTTER, J.    The bill charges that the defendants have obtained from the complainant two powers of attorney to convey each ten shares of stock in the American Screw Company, while he was in a very weak state of mind from attacks of epilepsy, by charging him with purloining, or converting to his own use, certain property from the defendant's grocery store where he was clerk, and by working upon his fears by confining him in charge of a police officer for a long time, and telling him that they had proof of the charges, and by other means of undue influence and duress.

It seems that about eleven to twelve o'clock on the 8th day of April, A. D. 1867, the complainant was approached in the store by a detective police officer, and asked to go up-stairs, and charged with this offence, and told that he must be taken before Judge Randolph at the Police Court ; and was detained up-stairs, with the exception of a few minutes, until after ten P. M., when the powers to transfer the stock were executed.    He was not suffered to be out of sight of the police officer but once, when he entered his father's house to get his stock certificates, and then but for five or ten minutes.

The answer of H. S. Hutchins admits the execution of the powers, admits substantially the detention of the complainant by the police officer, the charges made, and that they did tell him that they had proof of them.    It denies that the complainant was arrested or under duress, but alleges that he admitted that since September, 1866, he had fraudulently taken from the store about five thousand dollars' worth of goods ; and that he voluntarily and of his own accord, and to prevent exposure, executed the powers, one to transfer ten shares (claimed to be worth $5,500) absolutely, to cover the defalcation he admitted, and which shares have been transferred under it to said Hutchins ; and another for another ten shares of the same stock to be held as security for any further defalcations that might be discovered. No writing or memorandum was given to him to show the object of the transfer.

The defendants allege, that early on the morning of said 8th

April the complainant was detected in sending away from the store a keg of butter and a ream of paper, by a person of the name of Cozzens, and that the sales were not entered on any book. It is sufficiently proved that the butter was not good, but rank ; but there is considerable conflict of testimony as to its age. The defendants further say, that when charged with it he at first denied it, and then stated that he had marked it on the wall, as it was to be paid for in a day or two, but no such mark could be found, and that he said he had a memorandum of it, but that could not be found ; that the complainant had been allowed at his own request to open the store in the morning ; that the clerks had been forbidden to trust Cozzens, and that there is but one entry of morning sales on the cash book between April 1st and 10th, and that is on April 6th. The officer who testifies, recollects nothing said about any mark on the wall.

It is alleged, too, that the marks on the butter tub were erased, and that such was not their custom ; and on the other hand evidence is offered to show a practice among dealers to erase the marks on those goods which they have bought from another dealer in the same city.

No evidence is adduced of any sales of goods by him to any other than Cozzens, and there is evidence that the other clerks sometimes sold to Cozzens ; that some mornings sales were returned to the book-keeper, and that Cozzens sometimes paid for the goods he bought, the same day or the next. But Cozzens was in debt to Hutchins. Cozzens testifies that he bought goods there for himself and others ; that he bought of the others as well as of Anthony, and it would seem mostly damaged goods ; that he bought part for cash and part on credit ; that his indebtedness would average $75 to $100. Mr. H. S. Hutchins testifies that Cozzens told him that he divided the proceeds of these sales with Anthony ; if so, he was a co-conspirator in the fraud. Yet when Cozzens is examined, he is not asked whether he ever made such a statement ; he testifies that he never bought any goods of the complainant but what he paid for, except this tub of butter, and that he was to pay for in a few days, and that the butter was so poor he could not sell it. And Cozzens's testimony stands substantially uncontradicted, and no attempt has been made to attack his character for veracity, or to show any course of dishonest dealing.

Apart from the alleged admission made by the complainant while detained up-stairs by the police officer, the evidence against him is very slight indeed. It is alleged in the answer and in H. S. Hutchins's evidence, that he admitted that he had been taking goods from the store ever since September, 1866, and to an amount of about $5,000. Mr. C. P. Hutchins puts it that he had been taking goods for a longer time; indefinite, but more frequently since his return from New York in November. And Potter, the officer, says he admitted he had been taking for a year. Putting it at a year (and in November and December he had been absent), and the allegation or admission that he had taken $5,000 from a store where the evidence is that for a long time the stock on hand had not been over $3,000, is absurd. And if he made such an admission, as they say he did, it may well be taken as evidence, in connection with other circumstances, to show the state of mind he was in.

When first taken up-stairs he denied the charge; he denied it in the present bill, which was filed in five days after, and Dr. Mason, who attended him for two or three weeks in an attack of epilepsy the latter part of April, says that he became raving and beside himself, and that " during his wandering he constantly referred to the difficulties between himself and Mr. Hutchins. His accusations against him seemed to be the constant subject of his thoughts, but throughout the whole he constantly asserted his innocence. This occurred so often that I took particular notice of it."

It is claimed by the respondents that when he admitted the taking, he gave as a reason for it the expenses of his sickness in New York, which he stated amounted to $800 or $1,000. His brother testifies that these expenses, giving items, did not amount to $200.

It is proved by statements made by the respondents themselves to other persons, that about one to two P. M. on that day he was in so excited a state (one says " in a terrible state "), that they gave as a reason for not letting him go out that they were afraid he would throw himself into the river, or kill himself. And when it is considered that he was confined in company with an officer, as stated, for more than ten hours before the powers were executed, it seems almost impossible to believe that the transfers were

voluntary. He was possessed of a comfortable property, was not dependent on his employment, and it is alleged and not denied that at this time he had on hand unexpended dividends of ·$400. No expensive habits, except drinking, are charged against him. It is admitted that the relations between him and his employer were extremely confidential; that they were good friends. He had been in the store for a considerable number of years, nine or more, at a salary which was once fixed at $400, and which the complainant alleges so continued. Mr. Hutchins indeed testified that he expected him to serve for what he chose to give him, because he did not expect constant employment, meaning, as he says, that if at any time he asked for five dollars, he should give it to him. The books show, however, goods charged to him of about $500, and cash charges of $1,100, which it is not contended were paid for anything else but his services. And it is alleged that the complainant had several times loaned money to his employer, the last time a sum of $200, in June, 1867, and that the respondent, H. S. Hutchins, was at this time (April 8) in debt to the complainant therefor. The answer does not deny this, but claims that $150 of the latter sum had been paid; but on the other side it is claimed that this was paid on account, and it seems that it was charged on account. The bill alleges that the respondent was in debt to the complainant in from one to two thousand dollars, besides wages. The respondent admits he at one time borrowed of the complainant one thousand dollars, but paid it in a few days. And there is evidence put in to show that for some time the books had been loosely kept. The respondent says that when he came to examine them in order to settle up, he found errors to the amount of some thousands of dollars. And the inconsistencies in the testimony and arguments are numerous. If he admitted his offence within an hour, and voluntarily offered to convey, why wait until ten P. M. ? Why not have the transfer made in the company's books while the office was open? And they began to suspect him in April, and yet on the 6th of April they paid him the sum of $150.

That he was subject to attacks of epilepsy is not denied, and that in the November preceding he had had a severe attack in New York, from which he was a long time in recovering. And very soon after the execution of these powers, he was severely

City of Providence v. Adams.

attacked again ; we have the testimony of the physicians. And what perhaps ·is of more value, we have the testimony of Mr. Foster, a neighbor in trade, who says that he saw him the very morning (April 8) before business hours, under excitement, and that he had not considered him competent for business for months. And the statements of the respondents themselves as to his state of mind, shortly after, he was charged with the offence, have already been referred to. The witnesses on the other side only testify that they had seen nothing to indicate insanity or an unsound mind.

The complainant has put in evidence to show that the owner of the store had been a long time in embarrassed circumstances, that his credit was bad, that he was very often obliged to purchase of his neighbors to supply his customers, and that at or about the time when these charges were made he had discovered that he was $40,000 and more in debt.

All of which, if so, may account for the excitement on the part of the respondents, and for a disposition on their part to exaggerate any suspicions against Anthony.

*Decree. That the powers of attorney be set aside as absolute conveyances, but remain in force as security for such indebtedness of the complainant as may be hereafter established.*