GEORGE T. MARSH *et al. vs.* RHODE ISLAND HOSPITAL TRUST COMPANY, *Ex.*

JULY 22, 1941.

PRESENT: Flynn, C. J., Moss, Capotosto, Baker and Condon, JJ.

Moss, J. This is an appeal from a decree of the probate court of the city of Providence admitting to probate, as the last will and testament of Irene Borden Butler, late of Providence, deceased, a certain instrument which was executed by her on March 26, 1938, and in which the proponent, the appellee, was named as sole executor thereof and trustee thereunder. She died February 22, 1939, unmarried, and will be hereinafter referred to as Miss Butler.

One of the appellants, George T. Marsh, was named as coexecutor and cotrustee, with the proponent, in the last previous will executed by Miss Butler, in 1932, and a codicil thereto executed by her in 1934, and would receive a pecuniary legacy of the same amount under those former instru-

ments and under the one now in question. He would also receive under the former will, but not under the one now in question, an interest in articles of personal property. The other appellants are two persons who would receive substantially greater benefits under the two former testamentary instruments than under the later instrument, now in question, and two other persons who would receive benefits under the former instruments and nothing under the later one. None of the appellants is a blood relative of Miss Butler.

The appeal contained thirteen reasons of appeal; but some of them raise substantially the same issues and the only ones which we need to consider are the fifth, *viz.*: "That said Irene Borden Butler was not of sane and disposing mind and memory at the time of the execution of said instrument admitted to probate", and the eighth, *viz.*: "That said Irene Borden was induced to sign said instrument admitted to probate through the undue influence of George L. Shattuck and/or Mary E. Pringle."

The appeal was tried before a justice of the superior court and a jury, on the issues presented by the reasons of appeal above quoted; and the jury found a general verdict that the instrument in question "was not the last will and testament of the said Irene Borden Butler." At the request of the appellee certain issues were submitted by the trial justice to the jury for special findings; and on these the jury made the following findings: 1. "that Miss Butler was of sane mind at the time she executed the instrument of March 26, 1938"; 2. "that Miss Butler, at the time of the execution of the instrument of March 26, 1938, was affected by undue influence exercised upon her by Miss Pringle to such an extent that it was not her will;" 3. "that Miss Butler at the time of the execution of the instrument of March 26, 1938, was affected by undue influence exercised upon her by Dr. Shattuck to such an extent that it was not her will." No request was made for a special finding that Miss Butler at that time was affected by the combined undue influence of Miss Pringle and Dr. Shattuck.

Thereafter a motion for a new trial was filed by the proponent; and after a hearing thereon the trial justice filed a decision, in which, after discussing the evidence at considerable length, he disapproved, and set aside, as being clearly wrong, the special finding of the jury as to undue influence by Dr. Shattuck; but he approved the general verdict and also the special finding as to undue influence by Miss Pringle. He therefore denied the proponent's motion for a new trial.

The appellants have not brought to this court any bill of exceptions. Therefore, the case, as it now stands before us, must be determined on the basis that Miss Butler was of sound and disposing mind and memory at the time when the instrument in question was signed by her and that in its execution by her all the formal requirements for a valid will were complied with.

The case is now before us on the proponent's bill of exceptions, in which the only exceptions now relied upon are those numbered 7 to 11 inclusive and 23 to 25 inclusive. The others will therefore be considered as abandoned. The one that we shall first consider and decide is exception 25, which was taken to the decision of the trial justice denying the proponent's motion for a new trial.

In this motion ten grounds therefor were stated. Those which concerned the special finding of the jury as to undue influence by Dr. Shattuck are not before us for consideration, since the trial justice, in ruling on the motion, set aside that finding. Therefore, the questions now before us on the proponent's exception 25 are whether the trial justice erred, in his decision denying the proponent's motion for a new trial, because he did not hold that the special finding by the jury that the testatrix was unduly influenced by Miss Pringle was against the evidence and the weight thereof, and because he did not find that the general verdict was against the evidence and the weight thereof.

Under the circumstances, it seems clear to us, (ignoring one contention for the proponent that will be considered later), that the only ground upon which we could properly

find that the decision of the trial justice was erroneous in denying the proponent's motion for a new trial is upon the ground that he was clearly wrong in not finding that the special finding by the jury as to Miss Pringle was against the evidence and the weight thereof. We therefore shall decide that question before considering any other.

Miss Butler was at the time of her death and had been for many years possessed of a fortune of not much less than $300,000 and she had also enjoyed the net income of a trust estate of about $250,000. The only near relative whom she has had since the deaths of her father and mother, which occurred many years ago, is her first cousin, Mrs. Mary Butler Williams.

During her youth she became, by reason of school associations, a close personal friend of Eva Corliss, who afterwards by marriage became Eva Corliss Weeden, and Anne O. Foster, who never married and is one of the appellants. These friendships continued during the rest of Miss Butler's life.

Mrs. Weeden had a daughter Eva, now one of the appellants, who married the aforesaid appellant George T. Marsh. Mrs. Weeden also had another daughter, Hortense, who first married a Mr. Lawrence, by whom she had a daughter, and later married Henry D. Knight. She and he are both appellants, but she took no part in the trial of the case. The relations between the Weeden family and Miss Butler were so cordial that Mrs. Weeden's daughters always called Miss Butler "Aunt Irene".

Another close friend of Miss Butler for many years was Ada Marsh, sister of George T. Marsh. She was named as beneficiary to a much less extent under the instrument now in dispute than under the 1932 will, as originally executed and as modified by the codicil of 1934. But on account of mental trouble she has been confined to Butler Hospital since 1934, and has taken no part in this case.

George T. Marsh himself became very well acquainted and friendly with Miss Butler many years ago and acted as her

attorney for some years and drew several wills for her before he went abroad and served in the United States army during the world war. He did not resume the practice of law after his return to this country in 1919; but his relations with Miss Butler continued very friendly until her death.

Miss Butler first became acquainted with Miss Pringle in 1915, when the former was suffering from a rather severe illness, which involved a considerable increase of white corpuscles in the blood stream. This illness was accompanied by much abdominal pain and nausea. Miss Butler required expert nursing and almost constant attendance. Miss Pringle was then a young trained nurse, who had had considerable experience in nursing and was strong and vigorous.

She was employed to take care of Miss Butler, whom she nursed through this spell of sickness. She gave such satisfaction that she was retained permanently by Miss Butler, being provided with the comforts of a home and paid a salary of $35 per week, which was increased in 1936 to $42 per week, to correspond with the salaries of other trained nurses. She looked after Miss Butler's health, acted as nurse when needed, and was a companion to her. Miss Pringle continued to fill this position, accompanying Miss Butler on trips, including several trips to Europe, until Miss Butler's death, being with her almost constantly, except for a usual vacation of about a month in the late summer or early fall.

There is no question but that these two women were very much attached to each other and that their relations were always friendly; and that Miss Butler relied very much, and especially when she was not in good health, upon the care and attention and assistance in many ways which Miss Pringle gave her. Evidently Miss Pringle had nothing to do with her employer's business affairs, and apparently had none with the management of her household affairs, until after Miss Butler's last illness had become quite severe.

In the summer of 1926 or thereabouts Miss Butler was attacked again with a severe illness, similar to that which had attacked her in 1915; and she was very sick with it for

many months, part of the time in a hospital. During this illness she had much nausea and abdominal pain and showed serious nervous symptoms. Miss Pringle, as a nurse, took care of her and after about two years she recovered. Thereafter she remained in quite good health until late in 1936, when she suffered again from nausea and abdominal pain. Then, early in 1937, when she was about seventy-five years old, she was seized with an attack of leukemia, a disease the distinguishing characteristic of which is a great increase of white corpuscles in the blood stream and which is regularly fatal. From this disease she thereafter suffered constantly and severely and never recovered, becoming steadily worse, except for some intervals of temporary improvement. Throughout this illness nervous symptoms were very prominent, with constant worry, depression and apprehension of imminent death. During this illness she was attended and treated for these nervous symptoms by Dr. George L. Shattuck, a specialist in nervous disorders. For general treatment of her disease she was attended by Dr. Alex M. Burgess, who is a general practitioner.

Miss Butler over the years executed numerous wills. We see nothing to be gained by considering any of these before the ones drawn by Richard E. Lyman, a prominent attorney of this state, who drew for Miss Butler a will in 1928, one in 1931, one in 1932, a codicil thereto in 1934, and the will now in controversy. All of them, before this last one, followed a common pattern, with only minor changes from one testamentary instrument to the next.

In the 1928 will, the legacies of special interest to us now, for comparison with those of the 1938 will, were as follows: To Mrs. Williams was given $5000; to Miss Foster $5000; to Miss Marsh $15,000 and the income for her life from a trust fund of $35,000; to Mrs. Weeden the same as to Miss Marsh, with a provision that on the death of Mrs. Weeden, the principal of the trust fund should go to her lineal descendants then living, which, if that will had been in effect at Miss Butler's death and her daughters, Mrs. Eva Marsh

and Mrs. Hortense Knight should survive Mrs. Weeden, would have given to Mrs. Marsh and Mrs. Knight equally the principal of that trust estate on Mrs. Weeden's death. To each of these two daughters of Mrs. Weeden was given $5000; and the same amount was given to George T. Marsh and he was named as coexecutor and cotrustee with the Rhode Island Hospital Trust Company.

To Elizabeth T. Bridge was given $1000 and the income for her life of a trust fund of $10,000; to Miss Helen E. Praray was given $2000. To Miss Pringle was given $10,000 and the income for her life of a trust fund of $40,000. To Butler Hospital was given $25,000; to Providence District Nursing Association $5000. The residue of the estate was given to Rhode Island Hospital, including the principal of any trust estate that might fail at any time.

By the will of 1931 the trust estates for the benefit of Mrs. Weeden and Miss Marsh respectively were increased to $45,000 each; and Miss Pringle's legacy was increased to $15,000 and the trust estate for her benefit to $45,000. By the will of 1932, the legacy to Mrs. Williams was reduced to $1000; the bequest of $5000 to the Providence District Nursing Association was reduced to $1000; and the residue of the estate was divided equally between Butler Hospital and Rhode Island Hospital. No really substantial change from the will of 1932 was made by the codicil of 1934.

Great changes were made in the will of 1938. The legacy to Mrs. Williams was increased from $1000 to $5000 and so also was the legacy to Mrs. Bridge. The legacy to Miss Helen E. Praray was increased from $2000 to $3000 and that to Lillian Tornquist, nee Svenson, a domestic servant of Miss Butler, was increased from $500 to $3000. The legacy of $15,000 to Miss Marsh was eliminated and the amount of the trust estate of which she was to have the income for life was reduced from $45,000 to $20,000. In connection with this change it should be noticed that in the meantime she had had a mental breakdown and had therefore been placed in Butler Hospital. The legacy of

$5000 to Miss Foster was eliminated. The legacy of $15,000 to Mrs. Weeden had been eliminated and the trust of which she was to have the income for life was reduced from $45,000 to $40,000.

The gift over of the principal of this trust estate upon the death of Mrs. Weeden, which by the last preceding wills would then have gone equally to her two daughters, Mrs. Knight and Mrs. Marsh, if they should survive her, was eliminated and this principal would then fall into the residue of the general estate. Mr. Marsh, who, in every testamentary instrument by Miss Butler for many years, had been named as coexecutor and as cotrustee of the several trusts, was not named in either of those capacities. The gift to Mrs. Bridge of the life income of a trust fund of $10,-000 was eliminated and the outright legacy to her of $1000 was changed to one of $5000.

As to Miss Pringle the outright legacy to her of $15,000 was eliminated and in place of that and the life income from a trust estate of $45,000 she was given the income for life from a trust estate comprising all the residue of the estate, which would have amounted to about $190,000, less expenses of administration.

In each of the earlier wills above discussed, it was provided in the residuary bequest to the Rhode Island Hospital that so much of it as might be required should be used for the establishment and maintenance of seven free beds in memory respectively of Miss Butler's parents, her grandmothers, two uncles and an aunt, all deceased; and that the remainder of the bequest should be held as a fund in memory of her parents. In the instrument of 1938 it was provided that the residuary bequest to that hospital "be held and administered as a fund in memory of myself, the said Irene Borden Butler."

In each of these earlier wills, certain articles of tangible personal property were bequeathed to many different persons according to a list incorporated by reference in the will; and all the others were bequeathed to certain persons

who were principal beneficiaries in the will. In the wills of 1931 and 1932 these persons were Mrs. Weeden, Miss Pringle and Mr. and Mrs. Marsh, all as "joint tenants or owners". In the instrument of 1938, all articles of tangible personal property were bequeathed to Miss Pringle without restriction.

In the trial Miss Pringle, in her testimony, gave explanations or what might be considered explanations of some of the striking differences between the provisions of the instrument of 1938 and those of the earlier wills. As to the omission of the legacy of $5000 to Miss Foster which had been in all the earlier wills, Miss Pringle testified that after the execution of the later instrument she happened to mention Miss Foster to Miss Butler, and the latter then said that she had forgotten Miss Foster in her will and expressed regret and asked Miss Pringle to give Miss Foster something after Miss Butler was gone. She testified further that on the day after Miss Butler's death she saw Miss Foster and said that she was sorry that Miss Butler had not done anything in her will for Miss Foster and that Miss Butler wanted Miss Pringle to help Miss Foster out. She testified that she then offered to let Miss Foster have $100 at that time and admitted that she may have asked Miss Foster not to mention the matter to anybody, as Miss Foster had previously testified.

Miss Pringle also testified that sometime in 1937 Mrs. Knight had talked with her over the telephone and asked her to find out whether Miss Butler would be willing to help to pay the expenses of Mr. and Mrs. Weeden in the private sanitarium to which they had gone to live. She further testified that when she told Miss Butler about this, the latter was offended and refused to help, saying that she did not know how great would be the expenses of her own sickness. Miss Praray, who regularly spent a part of each week with Miss Butler at the latter's home, doing sewing for her, corroborated this testimony as to the making of this request and its refusal by Miss Butler, by a letter Miss Praray said.

Miss Pringle further testified, as to this matter, that Miss Butler afterwards repeatedly expressed disapproval of the conduct of Mrs. Knight and Mrs. Marsh in having their parents go into the sanitarium, instead of taking them into their own homes. But there was no testimony that in her relations with Mrs. Knight and Mrs. Marsh Miss Butler afterwards treated them otherwise than before, and there was much uncontradicted evidence that she continued especially friendly with Mrs. Marsh, receiving calls from her and going riding with her.

There was also testimony by Miss Pringle and several of her witnesses that during a period of some months before and some months after the execution of the will in question Miss Butler made remarks to the effect that "these people", evidently referring to the Knights and Marshes, were only interested in her for her money. On the other hand, Miss Pringle admitted that Miss Butler, during the last of her life, was very fond of Mrs. Marsh and always spoke well of Mrs. Knight and often expressed a wish that they would come and see her.

As to Mr. Marsh there was some testimony by Miss Pringle, and perhaps by others, from which it is argued, in behalf of the proponent of the will, that Miss Butler had lost confidence in his business ability for the reason that he had lost heavily in investments because of the severe stock market decline beginning in the fall of 1929, and that this was the reason why she did not name him as coexecutor and cotrustee in the will of 1938. But these losses did not prevent her from naming him as such in the will of 1932 and this part of that will was ratified and confirmed in the codicil of 1934. Her admiration for him and cordial relations with him and his wife in the winters of 1933-1934 and 1934-1935 are shown by the fact that in each of those winters she gave a dinner in his honor at which he and his wife and many intimate friends of his and their wives were entertained. The testimony shows no good reason why she should

have lost her esteem and cordial feeling for him after that time.

Late in 1936 Miss Butler had some trouble with her knee and Dr. Burgess was called to attend her. Having found, when attending her in her long spell of illness beginning in 1927, that she had a tendency toward leukemia, he had tests made for that, when called in late 1936. It was found that the number of white corpuscles in her blood were extremely excessive, showing that she had latent leukemia to a very serious degree; but no serious symptoms had then resulted.

He treated her for this leukemia from that time until July 2, 1937, just before she left for Sakonnet for the summer. Nervous symptoms soon became prominent and distressing and he had Dr. Shattuck called in on February 13, 1937 to give treatment for these. At that time she still showed no bodily symptoms especially characteristic of leukemia, but she was highly nervous, emotional, anxious and depressed, as the result of her belief that she had an organic disease of the blood from which she was convinced she would not recover, although she was not told that she had leukemia. She also had serious abdominal discomfort and distressing digestive symptoms.

The two physicians cooperated on the case until Miss Butler went to Sakonnet for the summer. In the meantime an enlargement of her spleen had developed and she was, on the whole, growing slowly worse, with more pain in the abdominal region. She was given some drugs to relieve her stomach distress and her nervous symptoms and to help her to sleep. Neither of these physicians saw her between the time when she went to Sakonnet in early July and her return in early September. She had a great deal of pain that summer in her stomach and abdomen and was extremely nervous; but apparently she consulted a physician only once.

Dr. Burgess resumed attendance on her on September 14, 1937, after she had returned to her home in Providence; and continued to attend her until the next summer, when she went again to Sakonnet. During the fall of 1937 and most

of the next winter she was taking only mild tablets to help her to sleep. She was extremely nervous, emotional and depressed and therefore Dr. Shattuck also resumed attendance on her, in January or February. She was then very weak and emaciated, but able to get out. The physicians tried their best to relieve her of the severe pains which she had in her stomach and abdomen and of her nervous troubles, but with very little success.

Dr. Shattuck testified that when he first saw her again in January 1938, her physical condition had become worse, but that her mind was clear. His records, produced at the trial, showed that in February, March and April, 1938, he attended her on February 10, March 12, 19, 23, 24, 25, 26, 29, 31, April 3, 4, 5, 6, 7, 8, 9, 14 and 19, and then resumed attendance after May 1.

Dr. Burgess testified that until February 15, 1938, Miss Butler had shown no difficulty in carrying on a conversation and no evidence of bleeding; and that there was nothing abnormal about her mental condition by that time. He testified also that from that time he saw no change in her until February 27, 1938, except that she was gradually growing worse. He testified that leukemia has no definite effect on the mind, except as the patient becomes weak; but that general weakness does eventually make a person less keen.

Bleeding at the mouth, one of the very serious features of leukemia, was first observed on March 18, 1938, and was followed later by bleeding from the bladder. A few days later x-ray treatments were begun, to control this bleeding and after a few weeks they did reduce it for some time. But meantime Miss Butler suffered greatly from this bleeding and from pain and extreme nervousness and anxiety. To relieve these symptoms and to ease the pain and to enable her to sleep, she was given sedatives including some hypodermic injections of morphine. These injections continued to be administered for some weeks before the bleeding and pain were brought temporarily under some control; and it

was during this period, March 23 to 26, inclusive, 1938, that the will in question was drawn and executed.

Dr. Burgess testified that neither on the day when it was executed by Miss Butler and witnessed by himself and Dr. Shattuck, nor at any time prior thereto did he see any indication that any one was influencing her as to that will; that he remembered nothing irrational about her on that day; that in his opinion she was then of sound mind; and that she was not a woman to be easily influenced against her wishes. He also testified that during that week he saw her frequently, including three times on that day; that her condition was getting progressively worse; that he did not think that she would live very long; and that he talked to Mr. Marsh and indicated that he would keep in touch with him.

The next day after the execution of the will a new trained nurse was brought in to care for Miss Butler and the next day after that another trained nurse was brought in, so that Miss Butler could have the services of both a day nurse and a night nurse, and Miss Pringle could be relieved from the labor of actual nursing. These two added nurses remained for a considerable period, until Miss Butler's condition had considerably improved again.

Miss Praray, the sewing-woman, testified that on Monday, March 21, 1938 she was reading to Miss Butler from the morning paper, when the latter spoke up and said: "I want to see my lawyer." She testified further that Miss Pringle then said to Miss Butler: "Don't you think you ought to see the doctor first?" and that Miss Butler made no answer to this; that Wednesday, two days later, Miss Butler asked her to telephone Dr. Shattuck and ask him to come a little earlier on that day, if he wished to; that she did telephone to Dr. Shattuck and he came and stayed a short time; that she left the room and that Miss Pringle was not at the house, while he was there.

Miss Pringle corroborated this testimony and further testified that she knew that Dr. Shattuck was coming to see

Miss Butler on the afternoon of the Wednesday mentioned, and that, when she returned that afternoon, she knew that he was there and that he and Miss Butler were discussing the changing of the latter's will. It is noteworthy that although Miss Butler had stated on Monday that she wanted to see her lawyer, this information was not conveyed to her lawyer until the next Thursday.

According to his testimony, Dr. Shattuck, on that Wednesday discussed with Miss Butler the making of a new will by her and on learning that Mr. Lyman had drawn her last previous wills, he advised her to have Mr. Lyman draw her new will and he wrote down a good many memoranda as to the provisions which she said she wished to have put in her new will and changes to be made from her last previous will. He testified also that she had previously told him that she wanted to provide more adequately for Miss Pringle; that she felt that the yield of the trust fund which was provided for Miss Pringle in her former will was not large enough to return sufficient income to take care of Miss Pringle in the way in which she wanted Miss Pringle to be taken care of.

The next day he met Mr. Lyman, at the latter's office, and talked with him about the matter of a will and turned over to him the memoranda made on Wednesday. Mr. Lyman had a conference with Miss Butler that next day at her home, having with him Dr. Shattuck's memoranda and copies of the last previous will and codicil or an abstract of their provisions. He then discussed with her in detail these memoranda and provisions in the former will and codicil, and the provisions that she wanted put into the new will and the changes to be made from the last one. She told him that she wanted to be sure that Miss Pringle would have an adequate income for life. As a result of the discussion with him, she made several very substantial changes in the instructions.

Although Miss Marsh, as stated *supra,* had been given by the will of 1932 an outright gift of $15,000 and the life

income from a trust fund of $45,000, Miss Butler's instructions to Dr. Shattuck had contained no provision for her at all; and it was only by reason of the conversation between her and Mr. Lyman in this conference that she changed her mind and instructed him to put in a trust provision of $20,-000 for Miss Marsh. So also it is apparent from his testimony that she had not directed Dr. Shattuck to have any provision made for Mrs. Weeden; and that it was only by reason of the conversation between her and Mr. Lyman that she instructed him to include in the new will a trust fund for Mrs. Weeden's benefit, which he evidently understood was to be for $40,000, but which she, at the time when the will was executed, said she had told him to make only $20,000.

She made no provision whatever for Miss Foster and apparently Mr. Lyman did not notice that omission. A natural conclusion from the evidence is that if Mr. Lyman had not called her attention to the provisions for Miss Marsh and Mrs. Weeden in the 1932 will and the absence of any provision for them in her instructions to Dr. Shattuck, she would have made no provision for any of the three friends of her youth, of whom she had always been so fond and for whom she had provided in her previous wills, very liberally as to two of them. The question naturally arises what had caused her to omit them all in her instructions to Dr. Shattuck?

After this conference Mr. Lyman returned to his office and had a draft of the new will prepared from her instructions. Late in the forenoon of the next Saturday he brought this draft of the new will to her home and discussed with her several questions with regard to it. He then, at his office, had the will put into final form for execution. Having an appointment elsewhere in the afternoon, he arranged with Dr. Shattuck and through him with Dr. Burgess to have the two physicians attend to the execution and witnessing of the will late that afternoon and he had it, in final

form, delivered to Dr. Shattuck. No attorney was present when the will was executed.

The two physicians went to Miss Butler's home and she read the first part of the will and then requested Dr. Shattuck to read the rest of it to her, as she was very tired. He did so and she listened to it and made some comments from time to time about it. After the will had been read through and she had approved it, it was executed by her and signed by the two physicians as witnesses. Then it was taken away by Dr. Shattuck, who a few days later delivered it to Mr. Lyman for safekeeping. Both of these physicians and Mr. Lyman testified that they saw no indication that Miss Butler was affected by undue influence in the matter of this will.

There was testimony from Mrs. Marsh that in the early part of Miss Butler's last illness, when they knew that she had leukemia and that it was fatal, Miss Pringle said that she could hardly live on the income from $40,000. Miss Pringle denied this testimony. According to testimony by several witnesses, Miss Butler, during a period of about a year before the will in question was executed, had said that she had not been fair to Miss Pringle; and that she had not made adequate provision for the latter; and had stated her intention to make a greater provision by will for Miss Pringle's support; and after the will was executed had stated that she had made such provision.

Both Mr. and Mrs. Marsh testified to events which occurred after the middle of 1937, which indicated, and from which they drew the conclusion, that from that time on Miss Pringle took more and more control of the management of the household and of Miss Butler. For instance, Mrs. Marsh testified that during that period, Miss Butler would ask to have a doctor called and Miss Pringle would say that she would call him the next day and not that day; and that she heard Miss Butler say: "Miss Pringle insists on having Dr. Shattuck. I don't want him." It was also shown, by uncontradicted testimony, that when the instructions for this will

were given and it was executed, Miss Butler had become very sick, tired, discouraged, frail and emaciated.

It was shown conclusively by the evidence in the case that Miss Butler, when she was in good health, was a woman of firm will and not easily influenced; and there was testimony to the same effect covering the period of her last illness. But there was also testimony from which it could be inferred that at times, and especially during the week when this will was executed, her will power was much impaired and she could be influenced by Miss Pringle to do what she herself did not wish to do.

It was also clearly shown by the testimony that injections of morphine had a very bad effect upon her mind and nerves and frequently produced delirium and delusions. Miss Pringle testified that she had to be "up all night" with Miss Butler on the night of the day when the will in question was executed and that arrangements were made for a trained nurse to come in the next day and an additional one the day after and to have them remain for an extended period, because Miss Pringle was unable to take care of Miss Butler any longer, under the circumstances. And the nurse who came the next day testified that she then found Miss Butler's condition very bad.

After a period of some weeks Miss Butler became much better and the morphine was discontinued and she even went to Sakonnet for the summer, though she had to be taken down and brought back in an ambulance. From that time on, she grew steadily worse, except for some intervals when she seemed a little better, until her death.

The main question now to be determined is whether the trial justice was clearly wrong in holding, as he did in his decision, that the special finding by the jury as to the exercise by Miss Pringle of undue influence upon Miss Butler and their general verdict were consistent with and supported by the law of the case and the evidence and did substantial justice between the parties.

It is well established by the decisions of this court that the issue of undue influence upon a testator may be established by indirect or circumstantial evidence as well as by direct evidence. See *Young* v. *Young,* 56 R. I. 401, 405; *Heroux* v. *Heroux,* 58 R. I. 79, 85; *Reynolds* v. *Marsden,* 60 R. I. 91, 97. These cases are here cited, not because of any similarity to the instant case in their facts, but because of the general principles therein stated and applied as to how the exercise of undue influence upon a testator may be shown.

As to the conclusion of the trial justice, in the instant case, concerning the special finding by the jury of undue influence by Miss Pringle, we are of the opinion that we cannot hold that he was clearly wrong in finding from the evidence that during the year just preceding the execution of the will in question Miss Butler "became emaciated and extremely weak in body and debilitated, discouraged, hopeless and helpless in spirit", and that her decline mentally was definite, though never to the degree that she became unsound in mind", and "that there were many hours and days . . . during many months preceding March 1938 when her condition from the standpoint of strong will power was below normal." Nor can we hold that he was clearly wrong in concluding that prior to March 1938 there was abundant opportunity for Miss Pringle to exert undue influence on Miss Butler, when the latter's will power was weakened or impaired.

As to the question whether Miss Pringle had actually used such opportunity and exerted undue influence on Miss Butler and thereby caused this will to be drawn and executed, the trial justice in his decision called attention to the radical differences between this will and all those which Miss Butler had executed over quite a long period of years and to testimony that Miss Pringle had shown her feeling that she would need for her support, after Miss Butler's death, more than was provided for her in the last previous will. He stated that this question of the use of undue influ-

ence was a question of credibility and primarily the credibility of Miss Pringle herself.

He stated that the evidence was so conflicting and of such a nature that different minds could naturally and fairly come to different conclusions thereon. His final conclusion was that in this state of the evidence, where the jury could naturally and fairly have decided the vital issue either way, he could not say that the verdict was wrong; but that he was of the opinion that the verdict and the special finding as to Miss Pringle "were entirely consistent with and supported by the law of the case and the evidence and does substantial justice between the parties."

In reading and considering his decision, we do not find that he has overlooked or misunderstood any of the pertinent evidence in the case or that he has failed to understand and apply the law applicable in cases of contests over wills on the issue of undue influence. We therefore see no reason why we should not apply to his decision the usual rule that an exception to a decision of a trial justice, in granting or denying a motion for a new trial on the ground that the verdict is against the evidence, should not be sustained by us, unless we are convinced that such decision was clearly wrong.

Our examination and consideration of the evidence in this case has convinced us that on the issue of whether the drawing and execution of the will in question was caused by undue influence, exercised by Miss Pringle upon the testatrix, the evidence was such that the determination of that issue might well depend upon the appearance and conduct of the witnesses in giving their testimony. In that respect, both the jury and the trial justice had a great advantage over us.

After allowing for this element, we have come to the conclusion that we cannot properly find that the trial justice was clearly wrong in refusing to set aside the general verdict or the special finding of undue influence by Miss Pringle.

The attorneys for the proponent of the will have made a

great many arguments in their printed briefs, comprising 178 pages. It is not practicable to discuss all of them in an opinion. The only one not already dealt with, expressly or impliedly, in this opinion and which, under the circumstances, we think merits discussion here, is the following: "The error of the jury in finding that Dr. Shattuck exercised undue influence so taints the whole verdict that there must be at least a new trial."

The first form of this argument is based on the following assertions by these attorneys: "The only rational explanation of the jury's findings is that they found that there was a conspiracy between Dr. Shattuck and Miss Pringle to influence Miss Butler" and "Since we now know that Dr. Shattuck was innocent, it follows that their finding as to Miss Pringle cannot be sustained on that theory." But no such conspiracy was charged in the reasons of appeal and when the case was submitted to the jury at the close of the testimony, it was not submitted on any theory of conspiracy. Therefore, this contention is not tenable.

The jury made a special finding "that Miss Butler at the time of the execution of the instrument of March 26, 1938, was affected by undue influence exercised upon her by Miss Pringle to such an extent that it was not her will." If the trial justice was not clearly wrong in refusing to set aside that finding, his decision denying the motion for a new trial should not be set aside.

It seems to us that the strongest form of the argument for the proponents which is based on the setting aside by the trial justice, as clearly not supported by the evidence, of the special finding of undue influence by Dr. Shattuck, is, in substance, as follows: That as the jury mistakenly found Dr. Shattuck guilty of undue influence, there is considerable probability that they disregarded his testimony against the exercise of undue influence by Miss Pringle; and that, if they had not done so, they would not have found her guilty of such influence.

But the trial justice, who saw and heard the witnesses testify, was in a far better position than we are in to determine whether there was any such probability or any substantial risk that the jury were thus misled. He did not find any such probability or risk; and, under all the circumstances, we are of the opinion that we should not, on this ground, sustain the exception to his decision denying the proponent's motion for a new trial.

For the reasons above stated, we are of the opinion that the proponent's exception 25, being to the decision of the trial justice denying its motion for a new trial, should be overruled.

The proponent's exceptions 23 and 24 were to the refusal of the trial justice to charge the jury that there was no evidence in the case to warrant a finding that Miss Pringle was guilty of exercising undue influence upon Miss Butler in connection with the will of March 26, 1938, and to his refusal to give a similar charge as to Dr. Shattuck. As must be obvious from what we have above stated in disposing of the questions raised by exception 25, we are of the opinion that exceptions 23 and 24 should also be overruled.

The only other exceptions remaining for consideration are those numbered 7 to 11, inclusive, being to the denial by the trial justice, at the close of the evidence in the case, of motions by the proponent that a verdict be directed sustaining the will; that the claim of appeal which charged undue influence by Dr. Shattuck should be struck out; that a verdict be directed that Dr. Shattuck had not exercised undue influence in the making of the will; that the claim of appeal which charged undue influence by Miss Pringle should be struck out; and that a verdict be directed that Miss Pringle had not exercised undue influence in the making of the will. We are of the opinion that from what we have above said in disposing of the questions raised by exception 25, the conclusion necessarily follows that exceptions 7 to 11, inclusive, should be overruled.

 251

As to Dr. Shattuck, the trial justice ruled that there was evidence to go to the jury that he had exercised undue influence. We cannot say that he erred in such ruling or that there is any inconsistency between it and his later ruling in setting aside the special finding of undue influence by Dr. Shattuck.

All of the exceptions relied upon by the appellee are overruled, and the case is remitted to the superior court for further proceedings following the verdict.

*Sherwood & Clifford, Sidney Clifford, Raymond E. Jordan,* for appellants.

*Tillinghast, Collins & Tanner, Greenough, Lyman & Cross, James C. Collins, Russell P. Jones, Henry W. Rigby,* for appellee.

