Barbara L. SLEBODA

v.

Henry J. SLEBODA.

No. 79–177–Appeal.

Supreme Court of Rhode Island.

May 14, 1982.

Joseph E. Marran, Jr., Pawtucket, for petitioner.

Alan T. Dworkin, Cranston, for respondent.

## OPINION

KELLEHER, Justice.

On August 22, 1959, Barbara L. and Henry J. Sleboda exchanged marriage vows, and in the process they undoubtedly promised to take each other "for better, for worse, for richer, for poorer, in sickness and in health * * *." After almost twenty years of married life, during which there was a substantial period when matters were worse rather than better and Barbara was

sick rather than healthy, the couple appeared before the Chief Judge of the Family Court to present testimony relative to Barbara's petition for a divorce, in which she alleged that irreconcilable differences had arisen between Henry and her which had led to the irreversible breakdown of the marriage. Barbara was also seeking a wide range of ancillary relief, including alimony, custody of the couple's two sons (aged sixteen and twelve), child support, and the partition by sale of the marital premises. At the conclusion of a somewhat extended hearing, the chief judge granted Barbara's divorce petition, deferred any action on her request for the sale of the real estate, awarded custody of the sons to their father, and ordered Henry to pay to Barbara weekly alimony of $70.

We are now confronted with cross-appeals. Henry's appeal is a single-issue effort whereas Barbara's presents us with a multifaceted one. We shall first consider Barbara's appeal, confining our discussion only to those issues that merit our consideration, and then we shall consider the issue raised by Henry.

Initially, Barbara claims that the chief judge completely overlooked the best interests of her two sons when he chose the father, rather than her, to be their custodian. In faulting the trial justice, Barbara argues that the decision would have been different if her attorney had been permitted to cross-examine the two boys. This contention must be viewed against the background of the "in sickness and in health" phase of the Slebodas' matrimonial relationship as well as what occurred in the Family Court.

Barbara presented as her witness a psychiatrist who had first treated her in October 1976 and was continuing to treat her at the time of Barbara's and Henry's confrontation before the chief judge. The psychiatrist reported that he had hospitalized Barbara on two different occasions when she was experiencing what he referred to as "manic-depressive disorder." During these episodes Barbara was either depressed or hyperactive. Barbara's first hospitalization

for this type of illness occurred following the birth of her son Paul in 1962, and the psychiatrist told the chief judge that his patient had been treated several times at Butler Hospital for similar episodes prior to his contact with her in 1976. Barbara's illness, according to the witness, was precipitated by stressful situations, such as conflicts within the marital relationship, the death of her father, or her involvement in motor-vehicle litigation in which the party at fault turned out to be judgment-proof. The witness also explained that Barbara's ability to care for the children's needs would be reduced during this stress-induced episode and that there was no guarantee that these episodes would not recur. It appears from the record that at one point Barbara left her Pawtucket domicile and moved to an apartment located in Cumberland.

It was agreed by counsel that the chief judge could question both sons about their thoughts on custody without counsel's being present and that the court stenographer would "read back to counsel" what the sons had to say to the chief judge. The chief judge first called the older son, Paul. He was sixteen and a high school sophomore. Paul told the chief judge that he believed that he and his brother were better off with their father because he had "leadership" and because their mother was not home all the time. Paul thought it best for the two of them to be able to turn to their father for advice, particularly about "girls."

A week later Raymond, the younger son, testified in open court. He was first questioned by Barbara's attorney. Raymond described Barbara as a good mother but added that things had been "getting bad." He expressed the wish to be with his father and said that he would visit his mother only if he had to. He described the times when his mother was ill; on those occasions the tension was so great that sometimes it interfered with his ability to do his school work. According to Raymond, his father was very considerate and understanding of his wife's problems.

It was at this point that Barbara's counsel asked for the opportunity to go into a redirect examination of the witness. The chief judge said no, explaining that he already had a good grasp of what was going on within the house. Counsel thereupon asked that Paul be summoned for cross-examination, but the chief judge obviously thought that enough was enough. Further questioning, he said, would impair the possibility of a continuing future relationship between the boys and their mother.

█ This court on prior occasions when confronted with controversies involving the custody of children has said that the weight to be given to the preference of the child is a matter within the sound discretion of the trial court, recognizing that while the expressed preference is not conclusive on the issue of what best promotes the child's welfare, such a preference is competent and highly probative evidence on the particular issue. In *King v. King*, 114 R.I. 329, 333 A.2d 135 (1975), we noted that a twelve-year-old boy who is passing from childhood into the teen years undergoes such significant biological and emotional changes with a consequent broadening of his intellectual horizons that these changes, we said, may well have an important bearing on the question of what would be in the best interests of the child with respect to his future custody. Later, in *Goldstein v. Goldstein*, 115 R.I. 152, 341 A.2d 51 (1975), this court, after noting the equivocal state of the record, upheld the award of custody of a nine-year-old child to her father on the strength of the youngster's expressed preference to go to Israel with her dad.

█ Here there is nothing equivocal about the record, nor are we dealing with a nine-year-old youngster. The desire of a child caught within the conflicting parental desires regarding custody assumes greater significance as the child grows older and hopefully more perceptive. With age, of course, comes an increased capacity on the part of the child to evaluate his or her own circumstances and to determine what living situation seems more advantageous. Admittedly, with age comes a decreased ability to impose a custody order on an unwilling child. *Poesy v. Bunney*, 98 Idaho 258, 262–63, 561 P.2d 400, 404–05 (1977). Even though a child's desires must yield to the paramount consideration of what is best for the child's ultimate good, the best-interest factor may be implemented by a placement in custodial surroundings that are compatible with the child's desires. The attitudes that accompany an expressed preference can overflow into other areas, especially the ability of the parent to cope with custodial responsibility, the hostility that can be generated between the custodial parent and the child, and the effect on the custodial setting by repeated attempts of children to see their favorite parent. Here the chief judge was well aware of all of the aforementioned elements when he ruled as he did in awarding custody of the boys to their father, and we perceive no reason that would cause us to fault his choice.

█ Barbara also claims that the chief judge's deferral of any action on her partition request was erroneous because she had an "absolute right" to this type of relief. Barbara's belief in absolutes is a bit misplaced because on several occasions this court has pointed out that when real estate cannot be divided by metes and bounds, relief by way of a partition sale is a matter that is directed to the sound discretion of the trial justice. *Matracia v. Matracia*, 119 R.I. 431, 378 A.2d 1388 (1977); *DeBartolo v. DiBattista*, 117 R.I. 349, 367 A.2d 701 (1976); *Bianchini v. Bianchini*, 76 R.I. 30, 68 A.2d 59 (1949). Here, the marital residence is a part of a multifamily dwelling, and as yet the chief judge has done nothing more than postpone a consideration of the equities, as he said, until "after entry of the [f]inal [d]ecree if the [f]inal [d]ecree is ever entered."[1] The chief judge's desire for fi-

---

1. A final decree of divorce is in order for entry three months "after the trial and decision" and may be entered by the prevailing party without notice at any time within the ensuing thirty days, but once the thirty days has expired, entry of the final decree in an answered case may be had only on motion and notice to the

nality of decree was prompted by his concern about the monetary problems that would face Henry if the sale were consummated to a third party and he and his sons would have to vacate the premises and "go out and rent." The chief judge's observations certainly make sense.

 In his appeal Henry has as his target the chief judge's order calling for a weekly alimony payment to Barbara of $70. This award was embodied in a decree entered on March 7, 1979. Henry refers us to *Gower v. Gower*, 101 R.I. 719, 227 A.2d 191 (1967), and *Prosser v. Prosser*, 51 R.I. 58, 150 A. 754 (1930), which hold that when a wife is the guilty party in a divorce proceeding, she forfeits any right to an alimony award. Henry also argues that the question of Barbara's entitlement to alimony should be remanded in light of *Carter v. Carter*, R.I., 413 A.2d 55 (1980), where it was pointed out that the General Assembly in its January 1979 session amended G.L.1956 (1969 Reenactment) § 15–5–3.1 to omit any reference to the fault of a party seeking an alimony award and also modified § 15–5–16 so that the "conduct of the parties during the marriage" would be a relevant factor to be considered in granting alimony. The other relevant factors cited by the Legislature were the length of the marriage; the health, age, station, occupation, amount and source of income, vocational skills, and employability of both parties; and the estate and liabilities and needs of each party. According to Henry, a remand is necessary so that the chief judge can properly evaluate Barbara's fault as well as the other factors found in § 15–5–16.

While we remanded in the *Carter* case for such an evaluation, we see no necessity for a remand here. In *Carter* the issue was whether the wife's overindulgence in the use of alcohol would bar a grant, but the trial justice had failed to characterize as fault this facet of the wife's behavior. Here, the chief judge, apparently with psychic power, had touched all the bases alluded to in § 15–5–16.

other party. G.L.1956 (1981 Reenactment)

Henry continues to emphasize the word "fault," and admittedly the chief judge in his bench decision did say, "I find her degree of fault greater than his." However, he then went on to say that Barbara "did not deliberately engage in these kinds of activities, but in some measure her judgment was impaired as a result of emotional problems that she's had over the last ten years" which had been exacerbated as the result of many hospitalizations, separations, and intrafamilial disputes. It is clear from the chief judge's extended remarks that he was not charging Barbara with fault and that his use of the term was a mere inadvertence, and we affirm the award.

Accordingly, both Barbara's and Henry's appeals are denied and dismissed, the decision appealed from is affirmed, and the case is remanded to the Family Court.