DECISION
In this civil action, plaintiff Kevin Tinney ("Kevin") asserts a claim for partition to divide Belcourt Castle ("Belcourt"), or to force a sale in order to receive a sum equal to one-third of his claimed interest. The defendants, Harle Tinney ("Harle") and Donald Tinney ("Donald") (collectively known as the "Tinneys"), object to the partition action and assert that Kevin is entitled to nothing based upon the following affirmative defenses: breach of agreement; accord and satisfaction; lack of equitable entitlement to partition; estoppel; the suffering of irreparable harm as a result of the division of Belcourt; and the procurement of deeds through undue influence, duress, and/or fraud. After a nonjury trial, each party submitted post-trial memoranda. Decision is herein rendered in accordance with R.I. Super. R. Civ. P. 52.
 Facts/Travel
Kevin filed a complaint seeking partition of two adjoining parcels of land located at 657 Bellevue Avenue, Newport, Rhode Island, commonly known as "Belcourt Castle." Belcourt sits on parcel one, while parcel two is an unimproved lot abutting the property to the south. Harold ("Harold") and Ruth ("Ruth") Tinney, founders of the Pickwick Club, purchased Belcourt in 1956 for $25,000. The Tinneys have resided at Belcourt since their marriage in 1960. Kevin first came to Belcourt in 1974 as Kevin Koellisch to complete some needed plumbing work well below the market rate. Initially, Kevin came to Belcourt as a plumber, and eventually became a one-third owner. After the introductory contact with the entire Tinney family, Kevin continued to perform various maintenance services around Belcourt such as painting, plumbing work, restoration, and electrical work. In return, the Tinney family began to invite Kevin to dinners. Eventually, Kevin rented an apartment at Belcourt. Kevin then learned how to restore stained glass and antiques through the guidance of the Tinney family. It was halcyon at Belcourt.
In 1989, Harold, the patriarch of the family, died. Harold and Ruth had been married for almost sixty years. Ruth was devastated by the loss of her husband. Ruth's behavior began to change, as did the relationship between her and Kevin.[1] In October 1990, Ruth adopted Kevin Koellisch, who then changed his name to Kevin Tinney. Kevin was thirty-seven, and Ruth was eighty-four. Donald signed the adoption petition in acquiescence.
At the time of the adoption, parcel one, containing the mansion, was owned by Ruth and the Tinneys as joint tenants, each having a one-third interest. On or about April 18, 1991, Kevin acquired an interest in Belcourt through a deed signed by Ruth and the Tinneys.[2] As a result of the conveyance, Kevin, Ruth, and the Tinneys held title to Belcourt as joint tenants, with each owning a one-fourth interest.
In 1993, Ruth suffered a stroke that deteriorated her health. On or about September 10, 1995, Private Properties contracted with Kevin, the Tinneys, and Ruth to sell Belcourt by signing an Exclusive Right To Sell to Individual.[3] The listing with Private Properties was for one year. However, Ruth died in December 1995. As a result of Ruth's death, Kevin and the Tinneys still owned Belcourt as joint tenants, each possessing a one-third interest.
In March 1997, the Tinneys severed the joint tenancy with Kevin by quitclaiming their interest in Belcourt to Amy Manning.[4] Amy Manning quitclaimed her interest in Belcourt back to the Tinneys who took title as tenants by the entirety.[5] As a result of the foregoing conveyances, the Tinneys owned a two-thirds interest in Belcourt as tenants by the entirety as to each other, and as tenants in common to Kevin's one-third interest. To reestablish the joint tenancy between the parties, Kevin and the Tinneys signed a Quitclaim Deed whereby they conveyed Belcourt to themselves as joint tenants in April 1997.[6] On or about September 5, 1997, Kevin and the Tinneys purchased what is known as parcel two of Belcourt as joint tenants, and signed a $550,000 mortgage together.[7] In November 1997, through two Quitclaim Deeds, the Tinneys changed title to their two-thirds interest in Belcourt from joint tenants to tenants by the entirety.[8] The joint tenancy among the parties was yet again severed. The Tinneys now own a two-thirds interest in Belcourt as tenants by the entirety as to each other, and as tenants in common to Kevin's one-third interest. Currently, Kevin and his companion, Roger Bisson, live in one tower of Belcourt, while the Tinneys live in another.
 The History of Belcourt Castle[9]
In the Posthumous Papers of the Pickwick Club by Charles Dickens (1836-1837), there is a place called Dingley Dell, where the inhabitants, called "Dellers," manage to become entangled in all of life's adventures. The Dellers represent all of humankind: good and evil, sophisticated and ignorant, beneficent, and avaricious. Belcourt is today's Dingley Dell.
The mansion at Belcourt, which majestically sits on the property, was originally built for Oliver Hazard Perry Belmont ("Belmont). Belmont hired architect Richard Morris Hunt in the late 1890s to build a 60-room Louis XIII summer cottage. Originally, Belmont named the property Belcourt. Richard Morris Hunt had an impressive resume of architectural plans as he designed Newport's own Griswold House, Fairlawn, Marble House, Ochre Court, and The Breakers. Oliver is quoted as saying that "Richard Morris Hunt is the greatest architect alive and I want the best for Belcourt." During this time period, Belmont and William K. Vanderbilt were best friends. Alva Vanderbilt divorced her husband in 1895 amidst rumors of her being in love with Belmont. Allegedly, however, it was Alva who was tired of her husband's philandering ways. Nonetheless, once Belmont and Alva married, she had free reign to reconstruct and redecorate Belcourt as she desired. Prior to Alva's death, she sold Belcourt to her brother-in-law Perry Belmont.
Perry owned Belcourt from 1925 until 1940. Since Peny equated Belcourt as the proverbial "White Elephant," he sold the property to George Waterman in 1940 on the condition that Waterman pay a penny on every 1890 dollar, and that he restore the property to the original plans due to his dislike of his sister-in-law Alva. Waterman had planned to use Belcourt as an antique auto museum, but zoning laws and protesting neighbors prevented the realization of his plans.
In 1943, Waterman sold Belcourt to Edward Dunn. At the time of purchase, none of the rooms in Belcourt were habitable. Although Dunn never lived at Belcourt, he maintained the property until 1954 when he sold it to Louis and Elaine Lorillard.
The Lorillards purchased Belcourt with a business plan in mind of conducting the jazz festivals on the property. Some of the citizens of Newport did not share the Lorillards' interest in this type of music and successfully campaigned to prevent any further jazz festivals at Belcourt. In 1956, the Lorillards sold Belcourt to the Tinney family.
The Tinney family purchased Belcourt in 1956 as a family restoration project, renaming the property Belcourt Castle. In 1957, Belcourt was opened to the public as a museum. Through the years, the Tinney family has had to overcome financial hardships and challenges from the neighbors to their right to operate a museum. Belcourt is now an eclectic showcase of furnishings, paintings, sculptures, and other artifacts from many countries displayed in ten rooms on two floors. To this date, Belcourt continues to be a home to the Tinney family, as well as a museum opened to the public and a banquet facility. Since 1972, the museum has been managed and leased by the Royal Arts Foundation ("RAF"), a non-profit corporation. Belcourt has continued its operation through the rents received from the lease with RAF, as well as funds derived from tours, donations, and a stained glass and restoration business.
 The Testimony
The facts and cast of characters in this lawsuit resemble those of a Charles Dickens novel. However, any references to Charles Dickens and his characters are not intended to convey disrespect to the litigants. Instead, said references demonstrate, as did Charles Dickens, that the human conditions in today's culture have not changed from those of the society 150 years ago. This Court utilizes humor and levity, even in its most serious cases, to keep life in perspective and maintain balance as it dispenses justice.
Kevin Tinney
["Uriah Heep" from David Copperfield — A clerk in the law office of Mr. Wickfield, whose partner he later becomes.
"I suppose you are quite a great lawyer," I said, after looking at him for some time.
"Me, Master Copperfield?" said Uriah. "Oh, no! I'm a very "umble person."
It was no fancy of mine about his hands, I observed; for he frequently ground the palms against each other as if to squeeze them dry and warm, besides often wiping them, in a stealthy way, on his pocket-handkerchief.
As time runs on, David finds that Uriah is obtaining an unbounded influence over Mr. Wickfleld, whom he deludes in every possible way, and whose business he designedly perplexes and complicates in order to get it wholly into his own hands; and, furthermore, that he looks with greedy eyes upon Mr. Wickfleld's daughter Agnes, to whom David himself is warmly attached. He even goes so far as to boast of this, and to declare his intention of making her his wife.[10]]
In support of his Complaint for Partition, Kevin testified that he initially came to Belcourt in 1974 to perform plumbing work to correct the poor building condition. After about six months, Kevin became a resident of Belcourt due to the fact that he was able to fix the heating at a low cost to the Tinney family. Kevin eventually moved into the South Wing of Belcourt but had to paint, restore, and complete plumbing and electrical work on the apartment to make the living quarters habitable. Kevin initially paid rent and had roommates move in with him to defray the cost.
The Tinney family began asking Kevin to dinner and various functions. Kevin testified that he was unofficially considered a general maintenance person but was not paid a salary. Kevin stated that during the 1980's, he devoted fifty to sixty hours per week working at Belcourt. Specifically over the years, Kevin testified that he fixed the sewerage line, painted the outside of Belcourt during a summer, and performed general painting, roofing, plumbing, and electrical work.
Kevin testified that his role in the operation of the museum involved taking brochures to different hotels and restaurants. However, Kevin and the Tinneys made all the decisions on the operation of the catering company and Belcourt Foundation, Inc. (the "Foundation"). In 1985, Kevin was given the position as general manager with the authority to implement rules, regulations, and safeguards, as well as hire employees, complete payroll, take checks, and maintenance. Prior to his removal in November 1997, Kevin testified that he was a "director and second to the corporation and assistant treasurer to the corporation" of RAF.[11]
On cross-examination, Kevin admitted that he had a real estate license and was aware of the various methods of ownership to real property. Kevin also testified that Ruth was not very distraught after the death of her husband of sixty years. Furthermore, Kevin admitted to taking Ruth on overnight trips, dancing, singing, horseback riding, kissing and hugging her in public, and having private conversations. Kevin denied asking Ruth to marry him. However, Kevin admitted to threatening Donald, not Ruth, by saying he would leave Belcourt within the year if Ruth did not follow through with the adoption. According to Kevin, his adoption resulted from the work he performed at Belcourt and the Tinney family dream of keeping the property as a museum for a hundred years after the last Tinney's death. However, Kevin acknowledged that he and his natural mother had a conversation about the adoption and the perception of others regarding Kevin selling his name for a buck.[12]
Kevin denied that the amount of work he performed at Belcourt diminished after his adoption and his receiving the initial one-fourth interest in Belcourt. Kevin maintained that he continued to work fifty to sixty hours per week until 1997. Kevin denied that he paid less attention to Ruth from the time his name was put on the deed to Belcourt to the date of her death.
Kevin testified that he was aware sometime in 1978 or 1979 that Ruth had a written will. Kevin remembered that the last time he had read any will by Ruth was sometime in 1984 or 1985. Kevin admits that at the time of his adoption he was aware that Ruth had a will leaving him nothing. On or about June 16, 1994, Kevin prepared a document entitled Revocation of Wills — Codicils, which Ruth, the Tinneys, and Kevin each signed.[13] Kevin testified that he received a sealed envelope from Ruth with the instructions not to open the envelope until after her death. At deposition, Kevin stated he put the envelope in his safety deposit box, but destroyed the envelope as requested by Donald in 1996 without reading its contents.[14] At trial, Kevin testified that he returned the envelope to Ruth after her surgery and destroyed another envelope in his safety deposit box.[15]
Kevin stated that Ruth told him she destroyed her own will.
Kevin alleges that there was an oral agreement in 1992 among Ruth, the Tinneys, and himself regarding ownership of the artwork. After Ruth died, Kevin stated that he prepared a document, at Harle's request, setting forth the interests of Kevin and the Tinneys.[16] The document was never signed by Kevin and the Tinneys but purported to give each party a one-third interest in the collection located within Belcourt.[17]
Kevin denies Harle's testimony that he attempted to get the Tinneys to sign the document at Ruth's wake.
Kevin testified that he lost approximately $27,500 in the commodities market. Kevin wrote the check to himself from the Foundation's checking account, Platinum Fund. Kevin contends that Donald gave his consent to the investment while Harle disagreed. However, the Tinneys contend that they were not aware of Kevin's actions. According to Kevin, he signed a note to repay the money in an effort to placate Harle as she was upset about the lost investment.[18] Kevin also admitted to taking another $28,800 from the Platinum Fund, but cannot account for the expenditure of the money.
Kevin also stated that he obtained a $30,000 line of credit on behalf of the Foundation from Wells Fargo. Kevin initially denied telling Wells Fargo he was the only principal of Belcourt, but finally admitted the foregoing when he discovered the conversation had been taped.[19] In response to his change of testimony, Kevin stated that Harle told him to say whatever was necessary to obtain the line of credit from Wells Fargo as Belcourt was experiencing financial difficulties. Harle testified that she did not know about the account until she received a letter from Wells Fargo. Nonetheless, Kevin admitted to writing checks to pay his own debts using the Wells Fargo line of credit.
Kevin claimed that he wanted to preserve the Tinney dream by keeping Belcourt as a museum open for the public for the next one hundred years, yet he told others he would solely own the property. Kevin testified that he believed he was protecting the best interests of Belcourt by filing a lawsuit against Harle for embezzlement, writing a letter to RAF regarding Harle's embezzlement, and writing the City of Newport regarding the violation of zoning ordinances due to Harle's catering business. Coincidentally, Kevin admitted that the catering business was in existence in 1994, but he did not write any letters to the City of Newport prior to November 1997, when he and Roger Bisson were removed from the board of RAF.
In an effort to demonstrate a pattern of behavior by Kevin, counsel for defendant questioned Kevin regarding his past history with older women. Kevin admitted to signing a note in 1982 in exchange for stock in the Fife Drum Corporation owned by Helen Baker, who was about sixty to sixty-five at the time. Kevin testified that he repaid some of the note, but the place went out of business and he filed a lawsuit against Baker. Additionally, Kevin discussed a transaction with Pearl Bogert [sic] who was in her sixties or seventies when she gave a mortgage to Kevin on an apartment building that he bought. Once again, Kevin stated that he failed to pay Bogert [sic] back the principal and interest on the note.
Harle Tinney
Harle testified that she was hired in the summer of 1960 as a tour guide for Belcourt. Harle and Donald met during that summer and were married in December 1960. The Tinneys moved into Belcourt sharing an apartment and adjoining bedroom with Harold and Ruth. Harle stated that the original Tinney family worked long hours in the stained glass window business and in maintaining the property, including but not limited to, cleaning, tours, and restoration projects. In the mid to late 80's, Harle testified that she often worked eighteen hours a day. However, the hours increased after Ruth's stroke in 1993. After ten years of marriage to Donald, Harle became an owner of Belcourt.
Harle testified that Kevin came to Belcourt in 1974 to perform plumbing work, but he did not become employed until 1986. From 1974 until 1986, Harle stated that Kevin primarily performed plumbing work, cleanup, and electrical work when asked. During this time period, Kevin did not conduct tours and participate in restoration work.
After the death of Harold in 1989, Harle testified that Donald was sick, depressed, inebriated, and suffering from anemia, causing him to be hospitalized on numerous occasions. Within a year of Harold's death, Harle testified that Ruth told her, "Kevin wants to marry me." Harle was shocked and told Ruth, "Mom, you can't do that, it's just not right." Harle stated that her position was supported by the fact that Ruth was eighty-four and Kevin was thirty-five and living with a man at Belcourt. Harle stated that she confronted Kevin with this information a few days later by specifically asking him, "Is it true you're thinking of marrying [Ruth]?" Harle testified that Kevin's response was, "Well, that would put me in a better position." However, in response to whether or not Kevin ever had a sexual relationship with Ruth, he answered the question at his deposition as "no, absolutely, positively not."[20]
In regards to the adoption of Kevin, Harle testified that Kevin coerced Ruth to sign the documents. Kevin threatened Ruth that he would leave Belcourt if she did not sign the adoption papers. Initially, Harle was happy about the adoption as Donald was ill and she could use Kevin's help in running Belcourt. Harle was led to believe that Kevin had the good of Belcourt and the Tinney family at heart. In fact, Harle sent a letter dated March 29, 1991 to Kevin in which she stated that, "You have chosen partnership in our family, and have worked and proven your love and loyalty . . . [and] caused me to think how important you are to this venture."[21]
However, the tide began to turn. Once Kevin's name was on the deed to Belcourt, Harle noted that Kevin's workload became infrequent, the time he spent with Ruth lessened, and he stopped having dinner with the family. Harle testified that Ruth prepared a will after the adoption of Kevin. The original was kept in a file cabinet in the office. After Ruth's death, the will could not be located. Additionally, the Tinneys were forced to sign a new deed in April 1997 with Kevin to reinstate a joint tenancy among the parties.[22] Harle stated that she and Donald had no choice but to sign the deed as Kevin threatened the Tinneys with the following actions: court action against the Tinneys; the reopening of Ruth's estate; jail for Harle's alleged illegal activities; having a group of investors take over Belcourt; and reporting to the police that Harle had killed Ruth by turning off her oxygen in the hospital. As a result of the threats, Harle testified that Donald began drinking. In response, Kevin denied he had threatened the Tinneys with any legal action.
Harle testified that Ruth, Kevin, and the Tinneys signed an agreement in January 1995 to prevent any of the parties from selling, removing, or transferring any of the collection inside Belcourt without written consent of the others.[23] The agreement was signed as Donald feared that items would disappear while the Tinneys were vacationing. The document was prepared by Kevin and recorded. Harle also testified that between the time of Ruth's death and the wake, Kevin prepared another agreement for the Tinneys' signature whereby Kevin and the Tinneys would each be a one-third owner of the collection at Belcourt.[24]
Harle stated that the Foundation received a letter from Wells Fargo indicating $28,800 was due and owing on its account. In a telephone call to the company, Harle informed Wells Fargo that she was not aware of the account and requested a copy of the application. Wells Fargo told Harle that the company approved the account over the telephone and provided a copy of the taped application.[25] "The tape revealed that Kevin applied for the account and made the following misrepresentations in order to obtain a line of credit: Kevin owned 100% of the Foundation; Kevin was the owner of Belcourt for the past twenty-three years; and his annual income was $150,000.
David Betzer
David Betzer ("Betzer"), nephew of Ruth and cousin to Donald, described Ruth as being the "matriarch."[26] Betzer stated that Kevin initially was hired to work at Belcourt, and the relationship with the Tinney family became closer until he moved into an apartment. Betzer commented on the fact that Harold "had a plain country attitude, a lot of savvy, did not like Kevin from day one . . . [and] was very skeptical about Kevin's purpose for being there and becoming close to the family."[27]
Betzer testified that in the latter part of 1997, Kevin proposed to him that the two of them form an alliance and take over running the museum as "Donny is insane and Harle is inept."[28] In commenting about whether Betzer liked Kevin, Betzer stated that "[t]here was a time when he was an agreeable, likable person, from our interactions; but it didn't take me very long to realize . . . that his motive for being there was nefarious, to say the least. . . ."[29]
Betzer observed Kevin and Ruth holding hands, walking arm in arm, and kissing. As Betzer had known his aunt all his life, he stated that Ruth's behavior was uncharacteristic and a radical change in her personality. Betzer testified that the interaction between Ruth and Kevin after the adoption lessened. The only conversation that Betzer and Ruth had about the relationship between her and Kevin was when she told him "she was glad to have a lover in Kevin."[30] Betzer noted that Ruth was depressed, lonesome, and out of control since Harold had died.
Betzer observed that Kevin's relationship with Donald after the adoption and the addition of Kevin's name on deed to Belcourt was more "combative," while his relationship with Harle and others was "colder and more difficult."[31] Additionally, Betzer observed Kevin removing two boxes from Belcourt and putting them in his car. Betzer was told by Lucy Rouse, an employee of RAF, that Kevin had taken paperwork out of the office.
Keith Greene
Keith Greene ("Greene") has worked at Belcourt since 1989 and has lived on the premises since 1998. Greene testified that Kevin said to him sometime in 1989 that, "I struck a gold mine."[32]
Kevin denied making the foregoing statement. In a conversation in January 1999, Kevin warned Greene to be careful of the Tinneys as they would stab him in back. Additionally, Kevin said that the Tinneys did not know what they were doing and Greene would always have a job when Kevin had Belcourt to himself "because he [Kevin] deserved it."[33]
Gregory C. Beals
Gregory C. Beals ("Beals") has been the banquet manager for Belcourt since January 1999 and has worked on the property for the past fifteen years as a bartender, caterer, and maintenance person. Beals testified that he met Kevin in the mid-seventies prior to the Belcourt connection. Beals stated that after Harold's death and prior to Kevin's adoption, Kevin doted on Ruth and called her "Mom."[34] Beals noted that Kevin did not address Ruth as Mom while Harold was alive. During the same time period, Donald was suffering from alcoholism and was hospitalized.
About a year and a half ago, Beals overheard Kevin state that he owned Belcourt and "he was going to take it over."[35] Beals also observed that after the adoption, Kevin no longer doted on Ruth, took more trips with Roger Bisson, and had worked fewer hours at Belcourt over the past couple of years. Beals stated that Kevin seemed to get between the relationship of Ruth and Donald, and both the Tinneys were not happy about the amount of time Kevin spent with Ruth. However, Beals testified that the Tinneys did not make an issue of the situation in the interest of family harmony.
Keith A. Henry
Keith A. Henry ("Henry") is a photographer who testified that he was at Belcourt approximately four to five times a week and was best friends with the Tinneys. Henry testified that he gave Kevin a birthday gift in 1995, at which time Kevin responded, "I'll take, but I'll never give anything back."[36]
Lucy Rouse
Lucy Rouse ("Rouse") is employed by RAF and has worked at Belcourt since the early eighties. Rouse observed that after Harold's death, Ruth was depressed and lonely. Rouse testified that Kevin and Ruth were together more often after the death of Harold. Rouse commented that the relationship between Kevin and Ruth was not of the type you would normally have with your son, especially the hand holding. As Rouse and Kevin had a good working relationship, they had many conversations regarding his adoption. Specifically, Kevin told Rouse that he "told mom [Ruth], that if she didn't adopt me, that I was leaving; I was not going to end up with anything."[37]
Although Rouse stated that Ruth was a demanding woman, after the adoption of Kevin in the Tinney family, Kevin would ask Rouse to tell Ruth that she did not know where Kevin was located. Rouse observed that Kevin was attentive in public to Ruth, but in private when he wanted to disappear, he could not be found. Rouse also described one particular event, the 100th birthday party of Belcourt, in which she drove Ruth home because Kevin refused to leave. Ruth stated to Rouse that she did not understand why Kevin wanted to stay at the party and not take her home.
Rouse also testified that until recently, Kevin completed all the electrical and plumbing work at Belcourt. Rouse indicated in her testimony that Kevin was the person who called the Newport electrical inspector to report the deficiencies in Belcourt's electrical system which he, himself, had repaired.
Dr. Marc P. Malkovich, III
["Mr. Wilkens Micawber" from David Copperfield — A gentlemen and mentor for David Copperfield; remarkable for his letter writing and speech making, and he constantly is "waiting for something to turn up."]
Dr. Marc P. Malkovich, III ("Malkovich") has been the General Director of the Newport Music Festival for the past twenty-five years, member of RAF for many years, first vice-president of RAF, and a family friend of the Tinney family. Malkovich personally observed the relationship between Ruth and Kevin.
Malkovich stated that he knew Ruth "extremely well" and described her as the "grandame [sic] of Belcourt," dressing beautifully, handling herself well, supported by her husband, and somewhat "imperious" or domineering.[38] Malkovich testified that Ruth "is something of a Victorian lady, very proper lady, as was Harold, I felt that she was — the loss of her husband was devastating to her."[39] As a result of Harold's death, Ruth's weakness showed and she cried very easily. Malkovich stated that Ruth reverted to the point where "[s]he became coquettish and little girlish in her manner and dress, and everything," completely opposite of her demeanor prior to Harold's death.[40]
Malkovich stated that he met Kevin sometime in 1987. His initial reaction was that Kevin was "too friendly" as he shook hands using both of his hands.[41] Malkovich's observation of Kevin was that "Kevin's motis operandi was to ingratiate himself . . . [and] [t]here was no question he considered himself a Tinney, and it was always a little bit surprising to me."[42]
Malkovich's observations of Kevin and Ruth from the death of Harold in 1989 until the time of his adoption in 1990, was that "[h]e was extremely solicitous of Ruth in a way I felt almost unctuous."[43] Malkovich eloquently testified that the relationship between Kevin and Ruth was "oily."[44]
Furthermore, Malkovich stated that he observed Kevin holding Ruth's hand and rubbing her. Malkovich thought it was "rather [a] bizarre sort of handling of the affection of — if he wanted to give affection, it wasn't the kind that I felt was proper."[45]
Malkovich also testified to a specific conversation he had with Ruth in July 1995 while attending one of the concerts held at Belcourt. Malkovich remembered where he and Ruth sat, and detailed that Ruth "had on a mink dress and ruby necklace, or at least red stones; and she was very reflective, and for the first time I felt that, in several years, she was her old self," but "very sad."[46] Ruth spoke to Malkovich about the adoption and "said how sorry she was; that she made a big mistake; and that there was a lot of trouble; and that she was very sorry that she did that."[47]
In regards to the lawsuit filed by Kevin against Harle alleging inter alia, embezzlement, Malkovich stated that he hired, at his expense, an accountant to review the books and records of RAF. The accountant found that Harle did not commit any wrongdoing, but that Kevin had written many checks without the proper documentation. As a result of Kevin's actions, Kevin and Roger Bisson were removed from the board of directors of RAF on November 25, 1998.[48] In a letter to the Newport Police Department regarding the incident, Malkovich, in the manner of Micawber uncovering Uriah Heap's efforts to gain control of his employer's assets, stated:
 "In my opinion Kevin Tinney is a dangerous con artist. It seems apparent to many of us that he ingratiated himself with the late Ruth Tinney (who was a good personal friend of mine), then got himself adopted by her. His reason is to take over Belcourt Castle . . . It seems to me that he made this accusation against Harley [sic] merely to cover his own blatant, if not criminal, behavior."[49]
In retaliation for the removal of Kevin and Roger Bisson from the board of RAF and Malkovich's support of Harle in the embezzlement lawsuit, Kevin wrote a letter dated February 23, 1998 whereby he withdrew his yearly support of the Newport Music Festival and contingently offered Belcourt for future events after the Superior Court ruled in the lawsuit and if deemed acceptable by the Tinney family.[50]
Ann Baker
Ann Baker ("Ann") is both a friend of the Tinney family and Kevin. At Kevin's fortieth birthday party, Ann observed Kevin and Ruth sitting physically close to each other, holding hands, and dancing together. Ann testified that Kevin had told her of his plan to take over Belcourt as he could do a better job than the Tinneys.
David Baker
David Baker ("David") is also both a friend of the Tinney family and Kevin. David testified that Kevin told him he wanted Belcourt to continue as a museum for the next hundred years, receiving nothing for himself. In another conversation, Kevin told David that the Tinneys were vulnerable and naive, and he intended to protect them from lawsuits.
Ellen Brady
Ellen Brady ("Brady") was hired by Harle in January 1996 as a bookkeeper to reconcile the books, records, and bank accounts of the Foundation, RAF, and the Platinum Fund account. To reconcile the books of RAF, Brady needed information due to affiliated transactions. The books, records, and checkbooks of the Foundation were in Kevin's possession during 1994, 1995, and 1996.
For the year 1995, Brady determined that the bank accounts for the Foundation indicated $24,640 was attributable to expenses incurred by Kevin without any supporting documentation. The entries were documented as checks payable to Kevin, checks payable to cash and endorsed by Kevin, and checks payable to third parties not associated with Belcourt and endorsed by Kevin. Expenses were also attributable to Kevin without any supporting documentation for 1996 in the amount of $18,658.24, and for 1997 in the amount of $22,905.36. Additionally, the bank accounts for RAF for the year 1995 showed $2,900 in expenses attributable to Kevin without any supporting documentation using the same type of check cashing methods. Brady did not find any irregularities in the books, records, and checkbooks of the Foundation and RAF that were attributable to the Tinneys.
Brady testified that the Platinum Fund was a joint checking account owned by Kevin and the Tinneys. Kevin had exclusive control of the Platinum Fund checkbook and refused to turn it over to Brady until July 1997. Brady stated that the Platinum Fund had a $43,000 balance as of September 1997. However, Brady received a statement on November 11, 1997 in which the account was debited by $27,500 on October 16, 1997, payable to cash, and endorsed by Kevin. Kevin admitted to losing the sum in the commodities market and signing a promissory note agreeing to repay the money with interest.[51] The money has never been repaid.
In October 1997, additional money was deposited into the Platinum Fund. Brady testified that Kevin made a telephonic transfer on November 11, 1997 in the amount of $28,800, which has never been properly accounted for by Kevin. Brady stated that when Kevin prepared the check for Harle's signature to pay the first mortgage payment with a new bank a few days later, the check was returned for insufficient funds since the account balance was $38.00 as a result of Kevin's telephonic transfer.
Brady testified that she closed all the accounts of the Foundation, RAF, and the Platinum Fund so that Kevin could not interfere with the running of the business. Brady also stated that Kevin attempted to fire her once he had learned that she was hired to reconcile the accounts of the various entities.
 Partition and Affirmative Defenses
Kevin filed this Complaint asking the Court to divide Belcourt between the Tinneys and himself. If the Court finds that Belcourt cannot be divided equally among the three owners, Kevin asks that the property be sold and the proceeds divided evenly. At trial, Kevin contended that Belcourt could not be partitioned by metes and bounds, while the Tinneys agreed that parcel one and the parcel that houses the entrance to the gardens cannot be partitioned by metes and bounds. Additionally, the appraiser testified that the property cannot be divided by metes and bounds. The evidence is uncontroverted that the value of Belcourt is $3,200,000, including a value for parcel two in the amount of $195,035.[52]
Joint tenants of a property may compel partition by filing a civil suit.[53] This Court has the authority to order a sale of Belcourt, if necessary.[54] "As between a sale and a partition, the courts almost universally have favored a physical division as not disturbing the existing form of the inheritance."[55]
Furthermore, "statutes which include a provision for a sale have been very generally construed to require that a division by metes and bounds must be made whenever practicable, and that the impracticability of such a division must be shown affirmatively before a sale will be decreed."[56] This Court finds that Belcourt cannot be divided by metes and bounds based upon the uniqueness and history of the property, the agreement of the parties, and the testimony of the appraiser.[57]
Case law has consistently held that when real estate cannot be divided by metes and bounds, the Court has discretion as to whether or not a partition sale should be ordered.[58] If Kevin believes that the law requires a forced sale of this unique, historical property, then the following statement from OliverTwist becomes apropos: "If the law supposes that," said Mr. Bumble, . . . "the law is a ass, a idiot."[59] The trial justice is "required to consider all facts and circumstances in evidence" before granting the sale.[60] Generally, the right to partition is not affected by inconvenience, difficulty in making the partition, hardship, or substantial loss or injury to some or all of the parties.[61]
Since partition is an equitable action, this Court must consider the facts and circumstances in evidence as applied to the affirmative defenses set forth by the Tinneys. The Tinneys have asserted the following affirmative defenses to negate Kevin's request for partition: breach of agreement; accord and satisfaction; lack of equitable entitlement to partition; estoppel; the suffering of irreparable harm as a result of the division of Belcourt; and the procurement of deeds through undue influence, duress, and/or fraud.
The Tinneys argue that the parties never agreed to sell Belcourt and as such, partition should be denied. According to the Tinneys, the Tinney family agreement envisioned Belcourt operating one hundred years into the future. Kevin countered that there was no agreement, only the Tinney family dream. Nonetheless, neither party submitted into evidence any written documentation supporting an agreement. However, a contract to list Belcourt for sale was signed by Ruth, Kevin, and the Tinneys in 1995.[62] Evidence was also presented that the Tinneys were looking for other real estate to purchase.
The Court does not doubt that the desire of the Tinneys was to operate Belcourt as a museum for one hundred years, and that Kevin knew about the plans and pretended to be a part of the dream. However, this Court finds that Kevin possessed a different agenda for Belcourt, to be discussed in minute detail infra, and restricting the sale of the property would not have been a beneficial or profitable act in Kevin's self-interest. Additionally, since Kevin's part-time occupation over the years has been drafting documents to secure his rights in Belcourt, this Court finds Kevin's testimony plausible regarding the fact that there was no agreement between the parties not to sell Belcourt. Otherwise, Kevin assuredly would have drafted a document. Accordingly, the defense of breach of agreement as applied to the partition action is without merit.
The next affirmative defense raised by the Tinneys is accord and satisfaction. An accord and satisfaction is defined as "[a]n agreement between two parties to give and accept something in satisfaction of a right of action which one has against the other, which when performed is a bar to all actions."[63] The doctrine of accord and satisfaction will operate as an affirmative defense to a partition action if the Tinneys can demonstrate that an agreement existed, and that agreement was accepted in exchange for refusal to press a right of action.[64] The Tinneys have failed to provide any evidence to the Court that an agreement of this type exists between the parties. In the absence of such evidence, the doctrine of accord and satisfaction will not defeat Kevin's partition action.
The Tinneys argue that the April 1991 deed and any subsequent deeds in which Kevin claimed an interest were procured by fraud. As fraud "vitiates all contracts," the Court has the authority to set aside the deeds if Kevin obtained an interest in Belcourt through fraudulent means.[65] To maintain an action in fraud, the Tinneys must prove the following: (1) Kevin knowingly made a false representation; (2) Kevin intended to induce the Tinneys and/or Ruth to rely upon the representation; (3) the Tinneys and/or Ruth justifiably relied on the representation; and (4) the Tinneys and/or Ruth were damaged by that reliance.[66]
The Tinneys have failed to provide the Court with sufficient evidence specifically demonstrating that Kevin made false representations to the Tinneys and/or Ruth which induced them to convey title to Belcourt through the April 1991 deed or any subsequent deeds. As such, the Tinneys' affirmative defense of fraud to the partition action must fail.
The Tinneys also argue that the April 1991 deed and any subsequent deeds in which Kevin claimed an interest was procured by duress. A conveyance of real estate will be set aside on the grounds of duress "when one by the unlawful act of another is induced to perform some act under circumstances which deprive him of the exercise of free will."[67] Duress is defined as "[a]n actual or a threatened violence or restraint of a man's person contrary to law, to compel him to enter into a contract or to discharge one," but "if the violence used be only a legal constraint, or the threats only of doing that which the party using them had a right to do, they shall not invalidate the contract."[68] The compulsion by one party against another party to perform an act is not necessarily duress.[69] A threat by one person against another to enter into a contract will not be considered duress unless the "threat excites a fear of some grievous wrong," such as death, great bodily injury, or unlawful imprisonment.[70]
The Court has reviewed the evidence and finds that Kevin unequivocally made many threats over the years to Ruth and the Tinneys. However, no evidence was offered at trial that Kevin threatened Ruth by death, great bodily injury, or unlawful imprisonment to sign the April 1991 deed. Although Ruth was threatened by Kevin that he would leave Belcourt if he was not adopted, the threat did not amount to a grievous wrong compelling her to sign the April 1991 deed.
None of the following threats uttered by Kevin rose to the level whereby the Tinneys should have feared a grievous wrong and signed the April 1997 deed: threatening to reopen Ruth's estate; threatening to have a group of investors take over Belcourt; and reporting to the police that Harle had killed Ruth by turning off her oxygen in the hospital. Additionally, the evidence does not demonstrate that the Tinneys were threatened by Kevin with death or great bodily injury when signing any of the deeds. The threat by Kevin to file a civil action against the Tinneys does not constitute duress as the Tinneys can assert their "rights in the threatened action, and this is ordinarily a reasonable alternative to succumbing to the threat, making the proposed contract, and then asserting [their] rights in a later civil action."[71] The threat by Kevin to Harle that she would be jailed for her alleged illegal activities does not rise to the level of unlawful imprisonment. As the evidence does not demonstrate duress was exerted by Kevin in any of the deed transfers, the Tinneys' assertion of a duress defense to the partition action fails.
The remaining affirmative defenses asserted by the Tinneys of equity, estoppel, irreparable harm, and undue influence will be addressed hereafter. However, the Court must initially point out that there is a distinction between law and justice. The law is an assemblage of rules written by the legislature and the courts. Justice is based upon the relationship of people, and is achieved when there is a pleasurable sense to the emotions. In seeking justice in Dingley Dell, we are looking at the relationship of the parties. The relevant law, as defined in Gilbert v.Marquis[72] and Huebel v. Baldwin,[73] is the standard used in proving undue influence.
Undue influence is the substitution of the will of the dominant party for the free will and choice of the subservient party.[74] Undue influence involves unfair persuasion of the subservient party, a milder form of pressure than duress.[75]
The plaintiff indicates that the Tinneys' burden of proof in demonstrating undue influence is a fair preponderance of the evidence.[76] However, this Court believes that the Tinneys have the higher burden to establish by clear and convincing evidence their right to have the deeds set aside.[77]
Generally, the exercise of undue influence of a party over another cannot be proven by direct evidence.[78] Since the perpetrator of such covert coercion will usually apply the forbidden pressure in secret, one seeking to set aside a deed must rely on circumstantial evidence.[79] "Facts and inferences which, when considered singly, are of slight and of different degrees of evidentiary weight, may often, when considered in combination, properly be held to furnish sufficient proof of undue influence."[80] The "mere suspicion, surmise or conjecture" by itself will not support a finding of undue influence.[81]
Whether the evidence of undue influence is direct or circumstantial, it must be connected with and operating at the time the deeds were signed.[82] Undue influence is to be judged on the facts on a case by case basis.[83] The Court should look at such factors as the following for undue influence: facts and circumstances surrounding the subservient parties; family relations; the condition of health and mind of the subservient parties; dependency upon and subjection of the control of the person supposed to have wielded the influence; the opportunity and disposition of the person to wield it; and the acts and declarations of such person.[84] Therefore, the solution of this case depends upon the credibility this Court attaches to the testimony of the parties and witnesses, and the probabilities and improbabilities disclosed by the evidence.[85]
With respect to undue influence, two cases are factually similar and determinative in this lawsuit. In Gilbert v.Marquis,[86] a lawsuit was filed to set aside the conveyances of three deeds from an eighty year old woman, Malvina V. Babcock ("Babcock"), to defendant Homer Marquis ("Marquis") who served as a handyman and errand boy. In lieu of the money Babcock owed Marquis, she had her counsel of many years draw a deed to convey certain real estate. The evidence was unclear as to whether an accord and satisfaction occurred as to the first deed, but Marquis kept working for Babcock without pay. Babcock then conveyed two additional deeds to Marquis, encompassing her remaining real estate, and all her personal property. Marquis drafted the last two deeds. Babcock died at the age of eighty-eight.
Marquis testified that Babcock transferred all her property to him because Babcock owed him money, and he was the only person she could depend upon to take care of her for her life. Testimony demonstrated that Marquis had prevented family and friends from seeing Babcock. Evidence was also presented at trial that Babcock was in failing health due to injuries and advancing years, and her mental powers were failing. The failure of Babcock's mental powers did not rise to the level of mental incapacity, but made her susceptible for someone in a confidential and trusted relationship to dominate her will. Marquis and his witnesses, of course, denied all the foregoing testimony. Evidence was also presented that an expenditure of $9,000 of Babcock's money could not be documented. Marquis had access to Babcock's checkbook and financial records. Marquis testified that Babcock directed him to burn some of her financial papers. The Supreme Court determined that the record was replete with evidence demonstrating that Marquis designed to obtain for himself all the property of Babcock through a highly confidential relationship.[87]
Although testimony showed that Marquis was kind to Babcock, the Gilbert court determined that the case was not one of mere kindness, but the "evidence strongly indicated that he successfully used this very kindness, this extreme solicitude, together with the exclusion of practically all her friends and relatives from access to her, to acquire and exert undue influence over her and thus to obtain all her property."[88] In determining how the relationship between Marquis and Babcock evolved, the trial justice answered that it was not a natural growth justified by natural causes, but an artificial thing conceived and nurtured by a designing mind stronger than Babcock, and Marquis was in a position of such trust and confidence that he was able to make that seem natural which was really the result of his own planning.[89] The trial justice found, and the Supreme Court affirmed, that the two deeds of real estate and all the personal property were obtained by Marquis from Babcock without consideration and by the exercise of undue influence.[90]
In the case of Huebel v. Baldwin,[91] Amanda S. Muenchinger ("Muenchinger") was a seventy-year old widow who owned a boarding house. After the death of her husband, Muenchinger met defendant Burton J. Baldwin ("Baldwin"), who was forty years old when he boarded at her home. Baldwin and Muenchinger became very friendly and corresponded with each other when Baldwin returned to New York. Muenchinger visited Baldwin in New York, and the following summer Baldwin resided at her home as an assistant in the management of her business. It was noted that Muenchinger was a woman of strong will and very considerable executive ability with no children or near relatives.
Muenchinger had a niece, Irene Huebel ("Huebel"), for whom she provided support and education. Huebel and other witnesses testified that Muenchinger promised Huebel would be provided for after Muenchinger's death. The relationship between Baldwin and Muenchinger became closer as they took trips together and dined privately. The testimony at trial demonstrated the relationship was one of great intimacy and confidence. Although no claim of impropriety in their intimacy was asserted, the situation was "somewhat unusual, and the conclusion that Mr. Baldwin had both the opportunity and the power to influence Mrs. Muenchinger to a certain extent, if he desired to do so."[92] Baldwin praised and complimented Muenchinger in public. Huebel claimed Baldwin's flattery was given with an "ulterior motive, the intention thereby insidiously to acquire a controlling influence over her will, not by coercion, but by indirection."[93] When Muenchinger died, all her property was devised to Baldwin, and he was appointed executor of the will and guardian of Huebel.
At the will contest. Baldwin presented his case regarding the execution of the will and the testamentary capacity of Muenchinger. Huebel presented evidence on undue influence. Without presenting any evidence to the contrary, Baldwin motioned the court for a directed verdict which was granted. The Supreme Court remanded the case for a new trial, finding Baldwin had the opportunity and inclination to impose his will on Muenchinger based upon their intimate and confidential relationship.[94]
The Court is aware that it is well settled that in an equity action the findings of fact made by a trial justice on conflicting evidence is entitled to great weight and will not be disturbed by the Supreme Court unless they are clearly wrong or fail to do justice between the parties.[95] In its quest for justice between the parties, this Court will detail its findings of fact as to whether or not the evidence demonstrated undue influence.
In addressing the validity of the April 1991 deed, the Court will first analyze the facts and circumstances which brought Ruth and the Tinneys to sign the deed to Belcourt giving Kevin a one-fourth interest. A review of the facts and circumstances will also encompass an analysis of the family relations and the condition of health and mind of the parties. Initially, the Court notes that Ruth and the Tinneys did sign the April 1991 deed. It is not the role of the Court to reverse gifts and/or business deals should relationships go sour, or if people fail to exercise sound personal or business judgment. Our society is one of capitalism, and we applaud those who are successful in their personal and business ventures. However, there are legal boundaries within which one cannot overstep in a quest for success, even if at first blush consent is given.
The Court finds that Ruth was the matriarch of the family as indicated by the testimony. This Court believes the testimony of Malkovich to be especially compelling regarding the change of personality of Ruth before and after the death of Harold. The testimony indicates that Ruth's behavior since the death of Harold was uncharacteristic and manifested a radical change. The Court finds that Ruth was devastated by the death of her husband and was more than likely suffering from depression and loneliness, acting as a lost soul. This Court also finds it incredulous that Kevin could testify that Ruth was not very distraught after the death of her husband of sixty years.
The testimony indicates that Ruth may have had a sexual relationship with Kevin at one time as Ruth and Kevin were observed by many witnesses acting in an improper manner by kissing, holding hands, and walking arm in arm. Ruth also referred to Kevin as her "lover." Nonetheless, the Court believes that the relationship between Ruth and Kevin was one of trust, confidence, and great intimacy. The Court finds Harle's testimony, as a whole, extremely credible, and believes that a year after Harold's death Kevin asked Ruth to marry him since marriage would definitely put Kevin in a better position. Falling the marriage route, Kevin pursued the adoption.
After the death of his father, the credible testimony indicates that Donald was sick, depressed, and fighting a battle with alcohol which caused him to be hospitalized. The Court believes that it was one of Kevin's goals to come between the relationship of Donald and Ruth. The testimony also indicates that Ruth never let Donald out from under her "apron strings" and controlled him while she was alive. The Court finds that Harle's relationship with Ruth was one of a servant. The Court also believes that both the Tinneys were afraid of Ruth and cowered to her wishes.
The Court finds that Kevin worked at Belcourt from 1974 to 1986 doing general maintenance work. Although he was not paid for his services, Kevin did receive room and board and meals. When Harold Tinney died in 1989, Kevin made his move. The Court finds that Kevin preyed on Ruth's situation and threatened Ruth that he would leave Belcourt after gaining her confidence and dependency. Kevin was adopted in October 1990, and his name was put on the deed to Belcourt in April 1991, something that took Harle ten years to achieve. The Court finds that Kevin's background in real estate enabled him to know exactly what he was gaining when Ruth and the Tinneys signed over a one-fourth interest in Belcourt. The Court believes that prior to the adoption, Kevin doted on Ruth and only called her "Mom" after Harold died.
After the adoption and the signing of the April 1991 deed, the Court finds that Kevin's workload around Belcourt diminished, he stopped having dinner with the family, and he took more trips with Roger Bisson. The Court believes that Kevin's doting relationship with Ruth lessened while he had the staff at Belcourt lying to Ruth about his whereabouts. The Court also finds that Kevin's relationship with Donald turned combative, while the relationship with Harle and others turned cold and difficult.
The facts and circumstances surrounding the parties at the time of signing the April 1991 deed, the state of the family relations, and the condition of health and mind of the parties indicate a situation rife with opportunity for someone unduly to influence the parties. Mere weakness or indiscretion of the parties will not be grounds to set aside the April 1991 deed unless accompanied by undue means made to induce the agreement and control the weakness.[96] The cause of weakness may be from "duress, general imbecility, accidental depression, constitutional despondency, or the result of sudden fear or apprehension."[97]
Like Babcock in Gilbert, this Court believes Ruth was also susceptible to someone in a confidential and trusted relationship to dominate her will despite her strong personality prior to the death of Harold. And like Muenchinger in Huebel, Ruth and Kevin shared a relationship of great intimacy and confidence. Due to the death of Harold, Ruth was distraught. In a moment of clarity, the Court finds that Ruth showed remorse as to the adoption of Kevin. As the testimony indicated, the Tinneys jumped to command if Ruth so ordered. The Court also finds that Donald was emotionally and physically unstable. Accordingly, the Court believes that the Tinneys would have signed anything, including the April 1991 deed, if directed by Ruth.
The Court now focuses on the facts and circumstances to determine the dependency upon and the subjection of Kevin's control, and his opportunity to exercise any undue influence. Factually, this case is exactly like Gilbert v. Marguis.[98]
The Court believes that Kevin, like Marquis, was kind to Ruth by taking her on overnight trips, dancing, singing, horseback riding, and having private conversations. Nonetheless, as inGilbert, Kevin used this very kindness, this extreme solicitude, to ingratiate himself into the Tinney family to acquire and exert undue influence over Ruth and the Tinneys to obtain all their property. Kevin artificially conceived and nurtured his relationship with Ruth and the Tinneys, and was able to make that seem natural as a result of his own scheming and device. Like Baldwin in Huebel, Kevin's ulterior motive was insidiously to acquire a controlling influence over Ruth and the Tinneys not by coercion, but by indirection. The evidence overwhelmingly demonstrates that Kevin was a bounder and a con artist seeing Belcourt as his own personal "gold mine." Based upon his past history with older women, the only dream Kevin was seeking involved full, sole ownership of Belcourt.
The Court finds credible the numerous acts and declarations of Kevin, as testified to by the Tinneys' witnesses, and which epitomized Kevin's true motivation for getting his name on the April 1991 deed. Once Kevin was secure and safe in knowing he owned Belcourt, his personality came "shining through." As stated previously, the evidence demonstrated that anytime Kevin would profit from a gift from the Tinney family, he would draft the document setting forth the rights of the parties, i.e. Revocation of Wills — Codicils, the document regarding ownership of the collection located within Belcourt, the document preventing Ruth, Kevin, and the Tinneys from selling, removing, or transferring any of the collection in Belcourt. The Court finds that the testimony regarding the missing will and money especially illustrates Kevin's ulterior motive. The Court finds credible the testimony indicating that Kevin had taken approximately $60,000 from the Foundation and approximately $60,000 from the Platinum Fund. Kevin cannot account for the money. Furthermore, Kevin changed his testimony regarding the location of Ruth's will. Kevin knew he was receiving nothing under Ruth's will and gave conflicting testimony as to exactly what Ruth gave him in one or maybe two envelopes. The Court believes that Kevin had Ruth and the Tinneys sign a document revoking any previous wills, and the evidence strongly indicates that Kevin destroyed Ruth's will as he knew he would receive nothing more.
The Court determines that Kevin reported infractions occurring at Belcourt not to uphold the law as he claimed, but only to use the reports as leverage to threaten and influence others to agreement. The Court finds the testimony credible that Kevin stated to various people he would own Belcourt for himself one day and his purpose was to achieve that goal. The Court also believes that Kevin would have taken the opportunity to force the Tinneys out of the museum and run the business on his own. The Court finds that Kevin destroyed and kept paperwork to suit his own purposes, not the good of Belcourt or the Tinney family.
In addition to the foregoing recitation of findings of fact, the Court determines that Kevin threatened the Tinneys with the following actions if the Tinneys did not reinstate a joint tenancy by signing the April 1997 deed: court action against the Tinneys; the reopening of Ruth's estate; jail for Harle's alleged illegal activities; having a group of investors take over Belcourt; and reporting to the police that Harle had killed Ruth by turning off her oxygen in the hospital. The actions of Kevin regarding forcing the Tinneys to sign the April 1997 deed was just plain greedy. Not only did Kevin want his one-third interest in Belcourt, but he was not content until he was assured to have the Tinneys' interest in Belcourt when they died. Kevin knew the difference between owning property as a tenant in common, where a co-tenant is not entitled to the interest of the other co-tenants at their death, versus owning property as a joint tenant, where the survivorship provision provides for automatic ownership to the remaining co-tenants at the death of one co-tenant. Possessing such knowledge, Kevin forced the Tinneys to reinstate the joint tenancy.
Until reaching its decision, the Court gave every presumption of validity to the deeds and the actions of Kevin, with said presumptions being overcome only by rebuttable evidence. In this case, the presumption has partially been rebutted by the Tinneys. "The acts and contracts of persons who are of weak understandings, and who are thereby liable to imposition, will be held void in courts of equity, if the nature of the act or contract justify the conclusion that the party has not exercised a deliberate judgment, but that he has been imposed upon, circumvented, or overcome by cunning or artifice, or undue influence."[99] Furthermore, if the "deeds were obtained by the exercise of undue influence over a man whose mind had ceased to be the safe guide of his actions, it is against conscience for him who has obtained them to derive any advantage from them," and the Court in good conscience should set them aside.[100] The facts and inferences taken as a whole indicate to this Court clear and convincing evidence of the exertion of undue influence by Kevin upon Ruth and the Tinneys.
The testimony demonstrated that Kevin's natural mother stated he would sell his name for a buck. The Court believes that is all Kevin deserves. However, no evidence was presented to the Court which would invalidate the September 1997 deed in which Kevin and the Tinneys purchased parcel two of Belcourt and signed a $550,000 mortgage together. Based upon the foregoing analysis, the Court finds that the April 1991 and the April 1997 deeds were procured through the undue influence exercised by Kevin upon Ruth and the Tinneys. The evidence in this case warrants that the Court set aside both the April 1991 and the April 1997 deeds.
The Tinneys have also asserted defenses of equity, estoppel, and irreparable harm in defense to Kevin's partition action. Estoppel bars a party from "raising certain rights or privileges when it would be inequitable to permit their assertion."[101]
Estoppel involves the action of both parties, arises by operation of law, and is dependent upon the showing of prejudicial reliance by the party asserting the theory.[102] As discussed previously, the Court cannot undo a bad business deal absent a showing of fraud, duress, and/or undue influence. Although the record is replete with evidence of undue influence as to the April 1991 and the April 1997 deeds, equity will not step in to set aside the September 1997 deed. Therefore, the Court finds that the September 1997 is valid. According to the appraisal submitted into evidence, the value of parcel two of Belcourt is $195,035. Kevin is entitled to one-third of the value of parcel two, or $65,011. The Court believes through the application of law, justice has been served.
As Belcourt is a historical landmark and the home has been in the Tinney family for over thirty years, the Court is allowing the Tinneys the option to buy out Kevin's share within six months for $65,011. Additionally, Kevin will have one month to vacate Belcourt. If the Tinneys are unable to purchase Kevin's interest in parcel two of Belcourt within the allotted time period, the Court will appoint a commissioner to sell parcel two.
Counsel shall prepare the appropriate order for entry, and the Court will hear counsels' motions on additional remedies, if any are so proposed.
[1] See The Testimony infra.
[2] P1. Ex. 1.
[3] P1. Ex. 8.
[4] P1. Ex. 3.
[5] P1. Ex. 2.
[6] P1. Ex. 4.
[7] P1 Ex. 7.
[8] P1. Ex. 5 and 6.
[9] Defs.' Ex. V.
[10] Gilbert A. Pierce, The Dickens Dictionary 300-01 (1872).
[11] Tr., Vol. I, dated April 26, 1999 at 31.
[12] P1. Dep. at 112-13.
[13] Defs.' Ex. A, B, and C; P1. Ex. 16.
[14] P1. Dep. at 125.
[15] Tr., Vol. II, dated April 26, 1998 at 16.
[16] Defs.' Ex. D.
[17] Id.
[18] Defs.' Ex. J.
[19] Defs.' Ex. T.
[20] P1. Dep. at 68.
[21] Defs.' Ex. W.
[22] P1. Ex. 4.
[23] Defs.' Ex. X.
[24] Defs.' Ex. D.
[25] Defs.' Ex. T.
[26] Tr. of April 27, 1999 at 7.
[27] Id. at 19.
[28] Id. at 8.
[29] Id. at 33-34.
[30] Id. at 10.
[31] Id. at 20.
[32] Id. at 41.
[33] Id. at 43.
[34] Id. at 48.
[35] Id. at 50.
[36] Id. at 60.
[37] Id. at 70.
[38] Tr. of April 28, 1999 at 4-5.
[39] Id. at 3.
[40] Id. at 5.
[41] Id. at 7.
[42] Id. at 5-6.
[43] Id. at 3.
[44] Id.
[45] Id. at 4.
[46] Id. at 7.
[47] Id.
[48] Defs.' Ex. N.
[49] Defs.' Ex. O.
[50] Defs.' Ex. P.
[51] Defs.' Ex. I and J.
[52] P1. Ex. 9.
[53] G.L. 1956 (1995 Reenactment) § 34-15-1, et seq.
[54] G.L. 1956 (1995 Reenactment) § 34-15-16.
[55] Lannon v. Lannon, 40 R.I. 60, 62, 99 A. 819, 820 (1917) (citations omitted).
[56] Id.
[57] See History of Belcourt Castle supra.
[58] Sleboda v. Sleboda, 445 A.2d 276, 278 (R.I. 1982);Matracia v. Matracia, 119 R.I. 431, 437, 378 A.2d 1388, 1391 (1977); DeBartolo v. DiBattista, 117 R.I. 349, 351-52,367 A.2d 701, 702 (1976); Bianchini v. Bianchini, 76 R.I. 30, 34,68 A.2d 59, 62 (1949).
[59] John Bartlett, Bartlett's Familiar Quotations 576 (1955).
[60] DeBartolo, 117 R.I. at 353, 367 A.2d at 703 (citingBianchini, 76 R.I. at 35, 68 A.2d at 62; § 34-15-16).
[61] Id. (citations omitted).
[62] P1. Ex. 8.
[63] Kottis v. Cerilli, 612 A.2d 661, 664 (R.I. 1992) (citingCavanagh v. Bostitch, Inc., 92 R.I. 12, 14, 165 A.2d 728, 729 (1960)).
[64] Id. at 665.
[65] See Travers v. Spidell, 682 A.2d 471, 472 (R.I. 1996) (citing LaFazia v. Howe, 575 A.2d 182, 185 (R.I. 1990)).
[66] See Id. at 472-73; Cliftex Clothing Co., Inc. v. Di Santo,88 R.I. 338, 344, 148 A.2d 273, 275 (1959).
[67] Peabody v. Tenney, 18 R.I. 498, 502, 30 A. 456, 457 (1893) (citation omitted).
[68] Id. at 502-03; See McGee v. Stone, 522 A.2d 211, 215 (R.I. 1987) ("a threat to withhold from a party a legal right that he or she has an adequate remedy to enforce does not constitute duress").
[69] Peabody, 18 R.I. at 503, 30 A. at 457.
[70] Id. 30 A. at 458.
[71] Restatement (Second) of Contracts § 175 cmt. b (1979).
[72] Gilbert v. Marquis, 61 R.I. 302, 200 A. 959 (1938).
[73] Huebel v. Baldwin, 45 R.I. 40, 119 A. 639 (1923).
[74] See Caranci v. Howard, 708 A.2d 1321, 1324 (R.I. 1998).
[75] Restatement (Second) of Contracts, Topic 2. Duress and Undue Influence, Introductory Note at 474 (1979).
[76] P1. Mem. of Law at 6.
[77] Passarelli v. Passarelli, 94 R.I. 157, 159, 179 A.2d 330, 332 (1962); Beaudoin v. Beaudoin, 85 R.I. 465, 468, 132 A.2d 834, 836 (1957); Dante v. Quilietti, 71 R.I. 4, 9, 41 A.2d 306, 308 (1945).
[78] Brousseau v. Messier, 79 R.I. 106, 110, 84 A.2d 608, 610 (1951).
[79] See Caranci, 708 A.2d at 1324 (citing Apollonio v. Kenyon,101 R.I. 578, 593-94, 225 A.2d 778, 787 (1967)).
[80] Apollonio, 101 R.I. at 593-94, 225 A.2d at 787 (citingHuebel, 45 R.I. at 44, 119 A. at 641; Goff v. Clinton, 53 R.I. 70,163 A. 747 (1960); Marsh v. Rhode Island Hosp. Trust Co.,67 R.I. 229, 21 A.2d 540 (1941); Brousseau, 79 R.I. 106,84 A.2d 608).
[81] Caranci, 708 A.2d at 1327.
[82] Brousseau, 79 R.I. at 110, 84 A.2d at 610.
[83] Huebel, 45 R.I. at 44, 119 A. at 641.
[84] See Mullen v. McKeon, 25 R.I. 305, 311, 55 A. 746, 749 (1903) (citation omitted).
[85] Dante, 71 R.I. at 10, 41 A.2d at 308.
[86] Gilbert, 61 R.I. 302, 200 A. 959.
[87] Id. at 308, 200 A. at 961.
[88] Id. 200 A. at 962.
[89] Id. at 309.
[90] Id.
[91] Huebel, 45 R.I. 40, 119 A. 639.
[92] Id. at 42 119 A. at 640.
[93] Id.
[94] Id. at 45, 119 A. at 641.
[95] Cianciarulo v. Tarro, 92 R.I. 352, 356, 168 A.2d 719, 721 (1961); McDonough v. McDonough, 88 R.I. 243, 248, 146 A.2d 234, 237 (1958); Albro v. Matteson, 64 R.I. 494, 497, 13 A.2d 391, 392 (1940); Gilbert, 61 R.I. at 304, 200 A. at 960.
[96] Anthony v. Hutchins, 10 R.I. 165, 176 (1872).
[97] Id.
[98] Gilbert, 61 R.I. 302, 200 A. 959.
[99] Anthony, 10 R.I. at 176 (citation omitted).
[100] Id. (citation omitted).
[101] Pancheo v. Nationwide Mut. Ins. Co., 114 R.I. 575, 577-78,337 A.2d 240, 242 (1975).
[102] Id.